**RESOLUTION TRUST CORPORATION,** As Conservator for Standard Federal Savings & Loan Association, Plaintiff–Appellee,

v.

Alexander J. STONE; Progressive Acceptance Corporation, an Oklahoma corporation; Union Planters Investment Bankers Corporation, a Tennessee corporation; Union Planters Investment Bankers Group, Inc., a Tennessee corporation; Investment Group Mortgage Corporation, a Tennessee corporation; Union Planters Corporation, a Tennessee corporation, Defendants,

and

Professional Investors Insurance Group, Inc., Defendant–Appellant.

No. 92–5140.

United States Court of Appeals, Tenth Circuit.

July 12, 1993.

Gene C. Howard (Eddie D. Ramirez and Sharon Womack Doty with him on the briefs) of Howard & Widdows, Tulsa, OK, for defendant/appellant.

R. Thomas Seymour (Sherry N. Taylor and David E. Booth with him on the brief), Tulsa, OK, for plaintiff/appellee.

Before ANDERSON, BRORBY, and EBEL, Circuit Judges.

EBEL, Circuit Judge.

## FACTS

This case arises from the purchase by a savings and loan of approximately $10 million in automobile loan paper known as "enhanced automobile receivables" ("EARs"). EARs are basically car loans purchased from automobile dealers and resold on the secondary market in a package that contains certain enhancements to insure collectability.

The original plaintiff in this action was Standard Federal Savings Bank ("Standard Federal"), the savings and loan that bought the EARs. After trial, however, Standard Federal was declared insolvent, and the Resolution Trust Corporation ("RTC") was substituted as conservator for Standard Federal's successor, Standard Federal Savings and Loan Association.[1]

The defendants in this action were Progressive Acceptance Corporation ("PAC"), which filed for bankruptcy and therefore was not a defendant at trial; Professional Investors Insurance Group, Inc. ("PIIGI"), which was PAC's parent company; Alexander Stone, the chief executive officer of PAC and PIIGI; Union Planters Corporation; Union Planters National Bank; and the "IBG defendants," consisting of Union Planters Investment Bankers Corporation, Union Planters Investment Bankers Group, Inc., and Investment Group Mortgage Corporation. However, all but PIIGI have voluntarily dismissed their appeals.

PAC created the EARs by purchasing consumer automobile notes from car dealers, repackaging them with certain additional features, and selling them to purchasers like Standard Federal. PAC sold the loans at a fifteen percent premium over the principal, but promised "enhancements" such as a buyback guarantee for receivables more than ninety days past due, servicing of the receivables, insurance, and reserves to pay for such enhancements. PAC sold approximately $200 million worth of EARs, $100 million of which had features similar to those sold to Standard Federal.

The IBG defendants acted as brokers between financial institutions and other firms in commercial transactions as a part of their business. The IBG defendants sold $25 million in PAC EARs in 1988 and 1989. Standard Federal was one of the IBG defendants'

---

1. We will refer to the RTC and Standard Federal as "the Plaintiff" when referring to the RTC's arguments on appeal or Standard Federal's actions at trial.

customers, buying a total of $9.7 million in PAC EARs through the IBG defendants in December 1988 and February 1989.

The IBG defendants did not sell any PAC EARs after April 1989. In August 1989, Standard Federal was notified that PAC had not purchased insurance for the EARs as it had promised, that it had not funded certain promised reserves, and that it was not meeting certain contractual obligations associated with servicing and payment of moneys to purchasers. Standard Federal subsequently suffered losses in excess of one million dollars. PAC filed for bankruptcy in March 1990.

Standard Federal filed this lawsuit in October 1989, alleging that the defendants were liable for state law fraud, breach of fiduciary duty, federal securities violations, and violations of and conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) and (d). The jury found that (1) Union Planters National Bank and Union Planters Corporation were not liable on any count; (2) Stone was not liable on any count; (3) the IBG defendants were liable for five counts of RICO fraud, one count of a violation of the Oklahoma deceit statute, and one count of a breach of fiduciary duty, and (4) PIIGI was liable on three RICO counts for fraud in the sale of securities, wire fraud, and bank fraud. The jury found PIIGI not liable for two other RICO fraud counts; five RICO fraud conspiracy counts; and one count alleging a violation of § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2).[2]

PIIGI now appeals, contending (1) that the district court erred in refusing to grant it judgment as a matter of law on the ground that EARs are not securities within the meaning of the Securities Act, (2) that there was insufficient evidence that PIIGI participated in the conduct of the enterprise to support the verdict against PIIGI on the RICO counts, (3) that there was insufficient evidence to support a finding of a pattern of racketeering activity under RICO; (4) that the district court erred in refusing to grant the defendants a new trial on the ground that the jury verdicts were inconsistent, (5) that

the court improperly questioned the jury foreman regarding the verdict, (6) that the district court erroneously refused to give a jury instruction requested by PIIGI on alter ego, and (7) that the district court erred in refusing to find that PAC was an indispensable party. We will address these seven issues in the order enumerated above.

## DISCUSSION

### I. EARS AS SECURITIES

PIIGI contends that the district court erred in ruling as a matter of law that the EARs were securities within the meaning of the Securities Act. We review de novo the district court's ruling on PIIGI's motion for summary judgment, which it affirmed on the plaintiff's motion for directed verdict, that the EARs are not securities. *United Bank & Trust Co. v. Kansas Bankers Surety Co.,* 901 F.2d 1520, 1522 (10th Cir.1990).

The Plaintiff alleged that PIIGI committed RICO fraud in the sale of securities by violating the Securities Act of 1933, 15 U.S.C. § 77a et seq. Section 77b(1) of the Act defines a security as:

any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscript to, or purchase, any of the foregoing.

Both PIIGI and the Plaintiff concentrate their arguments on whether the EARs are "notes" or "investment contracts" that are securities under § 77b(1). We hold that the EARs are not "notes" or "investment contracts" that qualify as securities under the

<hr>

2. The Plaintiff did not sue PIIGI for state law fraud or for breach of fiduciary duty.

Act.[3] Accordingly, we reverse the judgment in favor of the Plaintiff on Count 1 (RICO fraud in the sale of securities).[4] We will address first why the EARs are not notes under the Act, and second, why the EARs are not investment contracts under the Act.

## A. The Note Test

In *Reves v. Ernst & Young (Reves I )*, 494 U.S. 56, 65, 110 S.Ct. 945, 951, 108 L.Ed.2d 47 (1990) [*Reves I* ], the Supreme Court held that the "family resemblance" test was to be used in deciding whether an instrument denominated a note is a security. Under the *Reves I* test, we begin with the presumption that the EARs, as notes, are securities. *Id.; Holloway v. Peat, Marwick, Mitchell & Co.*, 900 F.2d 1485, 1487 (10th Cir.), *cert. denied,* 498 U.S. 958, 111 S.Ct. 386, 112 L.Ed.2d 396 (1990). However, because Congress was concerned with regulating the investment market, rather than creating a general federal cause of action for fraud, our inquiry does not end there. *See Reves I*, 494 U.S. at 65, 110 S.Ct. at 951. Rather, the presumption that a note is a security may be rebutted if the instrument bears a strong resemblance, in terms of factors identified by the Supreme Court, to an instrument on the judicially crafted list of notes that are not securities. *Id.* at 64–65, 67, 110 S.Ct. at 951, 952; *Holloway*, 900 F.2d at 1487. Types of notes that are not "securities" include:

> [T]he note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business ... [and] notes evidencing loans by commercial banks for current operations....

*Reves I*, 494 U.S. at 65, 110 S.Ct. at 951 (citations and quotations omitted).

We begin by noting that EARs certainly share some kinship to consumer financing because they are essentially consumer car loans that PAC purchased from car dealers, packaged with "enhancements" like insurance and servicing, and re-sold at a fifteen percent premium over the principal. The issue is whether the packaging, enhancements, and secondary marketing to financial institutions are sufficient to cause EARs to be considered securities, or whether the EARs' "family resemblance" to consumer notes is sufficiently strong to cause EARs to be included within the categories of notes that are not regarded as securities. *See Banco Espanol de Credito v. Security Pac. Nat. Bank*, 973 F.2d 51, 56 (2d Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993) (stating that participation in an instrument like a loan might be considered a security because of the manner in which the participation is used, pooled, or marketed—even though the underlying instrument is not a security). For this analysis, we turn to the four factors outlined in *Reves I:* the motivations of the buyer and seller; the plan of distribution for the instruments; the public's reasonable perceptions; and whether there are any risk-reducing factors suggesting that the instruments are not securities. *See Reves I*, 494 U.S. at 66–67, 110 S.Ct. at 952.

First, we examine the EARs transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it. *Id.* at 66, 110 S.Ct. at 951. "If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is ex-

---

3. The Supreme Court has consistently held that the definition of security in the Securities Act of 1933 is virtually identical to the definition of a security in § 3(a)(10) of the Securities and Exchange Act of 1934. *See Reves v. Ernst & Young*, 494 U.S. 56, 61 n. 1, 110 S.Ct. 945, 949 n. 1, 108 L.Ed.2d 47 (1990). We therefore will refer to cases involving the 1933 and 1934 Acts without distinguishing between which Act each case involved.

4. PIIGI was not found liable on the RICO securities count alleging fraud in the sale of the Equity Leveraging Transactions, and therefore does not appeal the district court's finding that those financial products were securities. *See* Aplt.Br. 21.

pected to generate, the instrument is likely to be a 'security.'" *Id.* However, "[i]f the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, the note is less sensibly described as a security." *Id.; see Holloway,* 900 F.2d at 1488 n. 1 (noting that use of proceeds to buy specific assets or services rather than general financing is an objective indicator of motivations of reasonable buyer and seller).

Here, PAC was not selling the EARs to raise money for general investments in PAC; rather, it was selling its stock-in-trade. EARs was a product that PAC sold as part of its on-going business activity. Although the buyers obviously hoped to profit from the inherent value of the product purchased, that expected profit was not tied to the profitability of PAC. Instead, the motivation of both parties appears to have been to enter into a commercial transaction. *See First Citizens Federal Sav. & Loan v. Worthen Bank & Trust Co.,* 919 F.2d 510, 515–16 (9th Cir. 1990) (construing Arizona law, which looks to the federal statutory definition of security, and holding that a loan participation agreement entered into to finance current operations of buyer was not a security); *Banco Espanol,* 973 F.2d at 55 (holding same under federal law).

Second, we examine the " 'plan of distribution' " of the instrument to determine whether it is an instrument in which there is " 'common trading for speculation or investment.' " *Reves I,* 494 U.S. at 66, 110 S.Ct. at 951 (quoting *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 351, 353, 64 S.Ct. 120, 123, 124, 88 L.Ed. 88 (1943)). To establish that there is common trading in an instrument, all that need be shown is that the instruments are offered and sold to a broad segment of the public; the instrument need not have been traded on an exchange. *Reves I,* 494 U.S. at 68, 110 S.Ct. at 953. The EARs here were not offered to a broad segment of the public but, instead, were sold to a very specialized and sophisticated secondary market that consisted of certain financial institutions and insurance companies, and they were not purchased for any potential speculative or trading value. We therefore do not believe that the Plaintiff has established that the EARs were commonly traded for speculation or investment. *See Banco Espanol,* 973 F.2d at 55 (affirming the district court's finding that where only institutional and corporate entities were solicited, and where resale of instruments required written approval, the "plan of distribution" factor cut against a finding that the notes were securities).

Third, we examine the public's reasonable perceptions to determine whether the EARs are securities. *Reves I,* 494 U.S. at 66, 110 S.Ct. at 951–52. The Court in *Reves I* found that the fact that the notes were advertised as "investments" and that nothing would have led a reasonable person to question this characterization suggested that the notes were securities. *See id.* In the instant case, the notes were promoted as "investments." However, the investments were primarily in the underlying consumer notes rather than investments in PAC. Thus, at best, this test leads us to no clear conclusions.

Fourth, the Supreme Court directs us to determine whether there are any risk-reducing factors that suggest the notes are not in fact securities. *Reves I,* 494 U.S. at 66, 110 S.Ct. at 952. The existence of other risk-reducing factors diminishes the need for protection under the Securities Act. The Court observed in *Reves I* that the notes there were uncollateralized, uninsured, and not otherwise subject to federal regulation. *Id.* at 69, 110 S.Ct. at 953. On the other hand, the EARs at issue in the instant case were often collateralized by the vehicles for which the underlying loans were made. We find that the existence of collateral is a risk-reducing factor that favors finding that the EARs are not securities.

On balance, applying the tests specified in *Reves I,* we hold that PAC's EARs do not qualify as notes that are securities. We therefore turn to the question of whether they qualify as investment contracts that are securities.

## B. *The Investment Contract Test*

We similarly conclude that the EARs were not a "security" under the Supreme Court's test for investment contracts. To determine whether a financial product is an investment contract, and therefore a security, the Supreme Court applies a test different from that which it applies to· notes:

> an investment contract ... means a ... scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party....

*SEC v. W.J. Howey Co.*, 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). The critical inquiry here is whether the plaintiff expected to receive "profits" from its investment in the EARs.

The Supreme Court refined the "profits" element of the *Howey* test in *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). There, the Court defined "profits" as "either capital appreciation resulting from the development of the initial investment, ... or a participation in earnings resulting from the use of investors' funds...." *Id.* at 852, 95 S.Ct. at 2060. We have interpreted *Forman* to mean that the receipt of specified interest payments is not the apportionment of profits under *Forman*. *See McVay v. Western Plains Corp.*, 823 F.2d 1395, 1399 (10th Cir. 1987); *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564, 576–77 & n. 10 (10th Cir.) (finding "profits" element met by employee benefit plan that yielded a profit through dividend distribution and appreciation in the value of the stock allocated to their accounts, unlike other benefit plans previously held not to meet the "profit" prong because they paid fixed or determinable benefits based on factors such as the age at which the participant retired), *cert. denied*, —— U.S. ——, 112 S.Ct. 589, 116 L.Ed.2d 614 (1991). Although *McVay* interpreted *Forman* in the context of a state law cause of action, several other circuits have come to similar conclusions in the context of federal securities law cases. *See, e.g., Kansas State Bank v. Citizens Bank*, 737 F.2d 1490, 1495 (8th Cir.1984); *Union Planters Nat'l Bank v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1184–85 (6th Cir.1981), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111; *American Fletcher Mortgage Co. v. United States Steel Credit Corp.*, 635 F.2d 1247, 1254 (7th Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981). Because the Plaintiff received specified interest payments from its investment in EARs, rather than dividends tied to the profitability of PAC or any other entity, the EARs do not meet the profits prong of the *Howey* test.

The Tenth Circuit cases cited by the Plaintiff to support its argument that it was entitled to profits from the EARs under *Howey* are distinguishable on the ground that the interest owners in those cases received dividend-like payments dependent on the profitability of the venture as opposed to fixed-interest-rate types of payments. *See, e.g., McCown v. Heidler*, 527 F.2d 204, 209 (10th Cir.1975) (involving real estate investment that "would result in a substantial increase in the value of the lots"); *Gilbert v. Nixon*, 429 F.2d 348, 354 (10th Cir.1970) (involving fractional working interests in oil and gas leases); *Continental Mktg. Corp. v. SEC*, 387 F.2d 466, 470 (10th Cir.1967) (involving investment transaction whereby purchasers "bought" beavers but left them at ranches where they would be cared for, with the inducement of reaping "geometric profits" as the beavers reproduced and offspring were sold), *cert. denied*, 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (1968). In addition, two of these cases were issued before *Forman* explicitly defined "profit" in 1974.

Because the Plaintiffs do not meet the profit prong of the *Howey* test, we find that the EARs are not securities within the meaning of the Securities Act. We therefore reverse the jury's verdict that PIIGI was liable for RICO securities fraud under Count 1.

## II. PARTICIPATION OF PIIGI IN RICO ENTERPRISE

PIIGI contends that the Plaintiff failed to prove all of the elements of a RICO claim. The defendant was convicted of violating § 1962(c) of RICO which makes it unlawful ·"for any· person employed by or

associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, *to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs* through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c) (emphasis added). To prove a claim under § 1962(c), the Plaintiff must show that PIIGI (1) participated in the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Phelps v. Wichita Eagle–Beacon,* 886 F.2d 1262, 1273 (10th Cir.1989) (citing *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985)). In particular, PIIGI contends that the Plaintiff failed to prove the first element—that it *participated* in the enterprise's conduct—and the third element—that there existed a *pattern* of racketeering activity. We will address PIIGI's participation in this section,[5] and the existence of a pattern in Part III.

"When a jury verdict is challenged on appeal, our review is limited to determining whether the record—viewed in the light most favorable to the prevailing party—contains substantial evidence to support the jury's decision." *Comcoa, Inc. v. NEC Teles., Inc.,* 931 F.2d 655, 663 (10th Cir.1991). The jury has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact. *Kitchens v. Bryan County Nat'l Bank,* 825 F.2d 248, 251 (10th Cir.1987).

The Supreme Court has recently spoken on what it means to "conduct or participate ... in the conduct" of the affairs of a RICO enterprise. The Court adopted the Eighth Circuit's "operation or management" test, which requires that the defendant have participated in the operation or management of the RICO enterprise before liability may be imposed. *Reves v. Ernst & Young (Reves II),* —— U.S. ——, ——— ——, 113 S.Ct. 1163, 1170–73, 122 L.Ed.2d 525 (1993). Thus, to be liable under § 1962(c), "one must have some part in directing those affairs" of the enterprise, *id.* at ——, 113 S.Ct. at 1170, although it is not necessary for the participant to have "significant" control, *id.* at ——— n. 4, 113 S.Ct. at 1170 n. 4 (rejecting the District of Columbia Circuit's formulation of the operation and management test in *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639,* 913 F.2d 948, 954 (D.C.Cir.1990) (en banc), *cert. denied,* —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991)). "[T]he word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required."[6] *Reves II,* —— U.S. at ——, 113 S.Ct. at 1170 (footnote omitted). Applying this standard, the Supreme Court in *Reves II* held that accountants who failed to inform the audited company's directors that the value of a company asset should be set significantly lower than it

**5.** PIIGI argues that the jury verdict finding it not liable on the RICO conspiracy counts "mandates the reversal of all findings of liability for RICO violations against PIIGI," apparently because the failure to find conspiracy liability means that "only specific actions attributable to PIIGI may be considered in a determination whether Plaintiff's evidence supports the verdict against PIIGI individually on the RICO counts." There is, according to PIIGI, no evidence that PIIGI took actions that would support RICO liability. Aplt. Br. 14, 15. However, as we explain in the text, we believe there is sufficient evidence that PIIGI participated in the conduct of the enterprise to support the jury verdicts. Consequently, we reject this argument.

**6.** We reject PIIGI's argument that the jury's finding that PIIGI was not liable to the plaintiff under § 12(1) of the Securities Act compels the

conclusion that PIIGI did not participate in the conduct of the RICO enterprise. In finding that PIIGI did not violate § 12(1), the jury implicitly found that PIIGI did not "directly or indirectly control[ ]" PAC because the court essentially directed a verdict against PIIGI on all elements of plaintiff's Section 12(1) claim except the issue of whether PIIGI was a controlling person and the issue of damages. *See* Tr. 2171. Such a finding, however, is not dispositive as to whether PIIGI participated in the conduct of a RICO enterprise. Participation for purposes of the RICO statute need not rise to the level of control required under § 12(1). Furthermore, the entity the jury found that PIIGI participated in the conduct of— the RICO enterprise—is different from the entity that it found PIIGI had not controlled under § 12(1)—PAC.

appeared on company records did not participate in the conduct of the RICO enterprise—even though using the lower valuation would have given a more accurate picture of the company's poor financial health. *Id.* at ——, 113 S.Ct. at 1174.

The relevant inquiry is thus whether PIIGI participated, directly or indirectly, in the operation or management of the RICO enterprise. The jury was instructed that the Plaintiff alleged that the RICO enterprise in this case consisted of an "associati[on] . . . in fact" of all of the defendants. Tr. 2178. The essence of the enterprise was the fraudulent and deceptive sale of EARs to Standard Federal and others. We find that, applying the *Reves II* test, the jury was entitled to infer that PIIGI participated in the conduct of such an enterprise.

There is abundant evidence of the PIIGI–PAC relationship. For example, the parties stipulated that Alexander Stone was at all relevant times chairman of the board and chief executive operating officer of both PAC and PIIGI. There was evidence that Stone took control of the day-to-day operations of PAC in May 1989.[7] Angell, the comptroller of PAC, reported to Hutchinson, the chief financial officer of PIIGI and PAC. The only PAC employees authorized to sign checks for PAC were either officers of PIIGI or employees of another PIIGI subsidiary, including Alexander Stone; Adrienne Stone, executive vice-president of PIIGI; and Cliff Sabin, secretary-treasurer of PIIGI. The jury could infer that PIIGI, through this close relationship, was participating with PAC in the conduct of the RICO enterprise.

Furthermore, between August 1988 and March 1989, PIIGI was a party to, or a guarantor of, Secured Value Pool Purchase Agreements and promissory notes totalling more than $50 million in connection with PAC's sales of EARs to Metropolitan Life Acceptance Corporation under contracts imposing duties on PAC similar to those imposed in its contracts with Standard Federal. PIIGI also guaranteed two, and perhaps three, other PAC contracts for the sale of EARs with three other purchasers as follows: First Commercial Bank on October 27, 1988; First National Bank of Russellville on November 22, 1988, and a purchaser whose name does not appear in the transcript, on September 25, 1987.

PIIGI and the IBG defendants also entered into an Automobile Loan Funding Agreement ["ALF"], under which PIIGI obtained nearly $740,000 in connection with PAC's December 1988 sale of EARs to Standard Federal. Tr. 571, 2328–34; 2335–72; 2382. The ALF agreements were used to help finance PAC's purchase of the automobile loans that would be repackaged as EARs.[8] In connection with the February 1989 sale of EARs to Standard Federal, PAC and the IBG defendants executed an ALF agreement in December 1989, which was guaranteed by PIIGI. The Union Planters defendants required that PIIGI provide guarantees under the ALF program, which was used to finance PAC's purchase of EARs. And while PAC was diverting investor premiums to the payment of expenses rather than promised enhancements for the EARs, PIIGI received from PAC nearly $1 million in payments on a loan. Again, this evidence could support an inference that PIGGI was participating in the conduct of the RICO enterprise of selling EARs via fraudulent misrepresentations in order to keep PAC afloat.

Looking at the evidence and inferences in the light most favorable to the Plaintiff, we hold that there was sufficient evidence to support the jury's finding that PIIGI participated in the conduct of the RICO enterprise.

## III. PATTERN OF RACKETEERING

 PIIGI contends that the district court erred in refusing to grant it judgement

---

7. Although Stone testified that he did not take over PAC until July 1989, Tr. 1409, the jury was entitled to disbelieve his testimony and to believe Angell's testimony that Stone took over PAC in May.

8. Under the ALF agreements, the IBG defendants would purchase some of the receivables for 83 percent of the principal, without any enhancements, for the interim period in which the pool of automobile receivables was being assembled for a particular investor. Tr. 543–44, 682–83, 1559.

as a matter of law because the Plaintiff failed to prove that PIIGI engaged in "a pattern of racketeering activity" as required for liability under RICO. Whether a pattern exists is a question of fact for the jury to determine. *See United States v. Pelullo,* 964 F.2d 193, 210 (3d Cir.1992); *Diamonds Plus, Inc. v. Kolber,* 960 F.2d 765, 769 (8th Cir.1992). Once again we review the jury's finding of continuity in the light most favorable to the Plaintiff, *Comcoa, Inc. v. NEC Tels., Inc.,* 931 F.2d 655, 663 (10th Cir.1991), and find that there is sufficient evidence to support the jury's finding.

RICO defines "racketeering activity" as any act in violation of specified state and federal crimes, including wire fraud, bank fraud, and fraud in the sale of securities. 18 U.S.C. § 1961(1). "Pattern," however, is less well defined: the only guidance found in the statute is that a pattern requires "at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5).

The Supreme Court has elaborated on RICO's limited definition of the "pattern" element. Although proof of at least two predicate racketeering acts are necessary to prove a pattern, that may not be sufficient. *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 236–37, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989) (citing *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985)). The Supreme Court has concluded that Congress intended that the pattern element "requires the showing of a relationship between the predicates, ... and the threat of continuing activity"—that is, "*continuity plus relationship.*" *H.J. Inc.,* 492 U.S. at 239, 109 S.Ct. at 2900 (emphasis added) (citations and quotations omitted).

Only the continuity prong of the pattern element is at issue in this case. "Continuity" is both a closed- and open-ended concept: closed-ended referring to a closed period of repeated conduct and open-ended referring to conduct that by its nature projects into the future with a threat of repetition. *See id.* at 241, 109 S.Ct. at 2902; *Phelps v. Wichita*

*Eagle–Beacon,* 886 F.2d 1262, 1273 (10th Cir. 1989). A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at 2902; *Phelps,* 886 F.2d at 1273. Predicate acts extending over a few weeks or months are insufficient to show closed-ended continuity. *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at 2902. Open-ended continuity depends upon the facts of each case, and may be established by showing that the predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit, or that the predicates are a regular way of conducting the defendant's ongoing legitimate business or the RICO enterprise. *Id.* at 242–43, 109 S.Ct. at 2902.

We find that two factors are particularly relevant to the determination of continuity. First, because continuity is "centrally a temporal concept," *Id.* at 242, 109 S.Ct. at 2902, we consider the duration of the related predicate acts. *See Pelullo,* 964 F.2d at 210; *Atlas Pile Driving Co. v. DiCon Financial Co.,* 886 F.2d 986, 994 (8th Cir.1989). Second, we consider the extensiveness of the RICO enterprise's scheme. Multiple on-going activities are more likely to satisfy the continuity requirement than would be several sporadic, albeit still related, acts. Under the rubric of "extensiveness," we consider a number of factors: [9] the number of victims, *see Sil–Flo, Inc. v. SFHC, Inc.,* 917 F.2d 1507, 1516 (10th Cir.1990); *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1413 (3d Cir.) *cert. denied,* —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991); *U.S. Textiles, Inc. v. Anheuser–Busch Cos., Inc.,* 911 F.2d 1261, 1268 (7th Cir.1990); *Menasco, Inc. v. Wasserman,* 886 F.2d 681, 684 (4th Cir.1989); the number of the racketeering acts, *see Pelullo,* 964 F.2d at 208; *U.S. Textiles,* 911 F.2d at 1269; the variety of racketeering acts, *see U.S. Textiles,* 911 F.2d at 1269; *Atlas,* 886 F.2d at 994; whether the injuries caused were distinct, *see U.S. Textiles,* 911 F.2d at 1269; the complexity and size of the scheme,

---

9. We do not suggest that any of these factors must be present in order to find continuity. Rather, they merely provide indicia by which the

continuity of specified racketeering activity may be judged, and they assist us in evaluating the significance of the temporal element.

*see Atlas,* 886 F.2d at 994–95; *Menasco,* 886 F.2d at 684; and the nature or character of the enterprise or unlawful activity, *see Pelullo,* 964 F.2d at 208; *United States v. Indelicato,* 865. F.2d 1370, 1383 (2d Cir.1989). In assessing continuity, we analyze these factors with the goal of achieving a "natural and commonsense result." *U.S. Textiles,* 911 F.2d at 1267 (citing *H.J., Inc.,* 492 U.S. at 237, 242, 109 S.Ct. at 2899; 2902). In doing so, we may consider external facts that are not necessarily charged as predicate acts. *See United States v. Alkins,* 925 F.2d 541, 552 (2d Cir.1991) (considering evidence of crimes not charged in indictment).

We first consider the duration of the scheme. Some evidence was presented at trial from which the jury could infer the scheme lasted as long as eighteen months, and there was extensive evidence of sales to various financial institutions between the August 1988 and April 1989. Richens testified that "other investors" besides Standard Federal received the prospectus, Tr. 1644; in fact, he could not think of any buyers of EARs in 1988 or 1989 who did not receive the prospectus, to which a summary sheet misrepresenting the net worth of PAC was attached.[10] Therefore, there is evidence from which the jury could infer that the scheme lasted from seven or eight months to perhaps as many as eighteen months. We find that this is a sufficient duration to support the jury's finding of continuity, particularly in light of the evidence of the extensiveness of the scheme, which is discussed below. *Cf. Kehr Packages,* 926 F.2d at 1413 (stating that although a single fraudulent scheme can give rise to RICO liability when that scheme is short-lived and directed at a limited number of people, the circuit has required some further indication that the defendant's fraudulent activities are likely to continue).

We next consider the extensiveness of the scheme. The first factor we look at is the number of victims in the scheme. RICO is not aimed at the isolated offender. *See Sedima,* 473 U.S. at 496, 105 S.Ct. at 3285 n. 14.

Given the broad distribution of the prospectus and the large number of sales of PAC EARs, the defendants' scheme in the instant case clearly had the potential to extend to other persons and entities. In fact, the evidence establishes that at least eight other banks bought PAC EARs with features similar to those bought by Standard Federal, and of those banks, none were told that there were no cash reserves or that PAC was in financial trouble. The jury could infer that the same misrepresentations occurred in similar sales to other banks during the eighteen-month time period. This case is unlike *Sil-Flo,* where we noted that the scheme was "directed at one individual with no potential to extend to other persons or entities." 917 F.2d at 1516; *see U.S. Textiles,* 911 F.2d at 1269 (noting the plaintiff "has given no indication that this is a type of activity in which [the defendant] normally engages or, indeed, that there are other potential ... victims waiting in the wings").

We also consider the number and variety of racketeering acts. Here the jury specifically found that PIIGI committed RICO wire, bank, and securities fraud. Although some courts have expressed a concern that mail and wire fraud may deceptively create the appearance of a pattern because often the mailing or use of wires is "only tangentially related to the underlying fraud" and is only "a matter of happenstance," *U.S. Textiles,* 911 F.2d at 1268 (quoting *Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271, 1278 (7th Cir. 1989)); *see Feinstein v. RTC,* 942 F.2d 34, 46 (1st Cir.1991); *Kehr Packages,* 926 F.2d at 1414–15, we see no such problem here. Unlike *U.S. Textiles,* where the mail and wire fraud activities continued long after the actual fraudulent activity underlying them was complete, here the jury could find that the wire fraud activity was associated with ongoing acts of fraud. For example, the purchasers of the EARs wired the money for the purchases to the PAC. Moreover, Standard Federal tried this case in part upon a theory that the defendants were operating a Ponzi

---

10. The prospectus was sent to IBG customers who were potential buyers of PAC EARs and included a summary sheet representing that PAC had a net worth of over $9 million and assets in excess of $70 million. Actually, PIIGI's 10-Q filing for June 30, 1988, which was also included in the prospectus, showed that the these numbers were for PIIGI, not PAC. PAC never had a net worth of that magnitude; in fact, as of December 1988, PAC's net worth was about $459,000.

scheme that required subsequent fraudulent sales to cover for the earlier acts of fraud.

The injuries suffered by the victims in the scheme were also quite distinct, again favoring a finding of continuity. Standard Federal suffered two separate injuries stemming from the purchases of EARs it made under the December 1988 and February 1989 contracts. The jury could have inferred that PAC would have continued to sell EARs to Standard Federal for as long as Standard Federal wanted to purchase them. It also could have inferred that other purchasers were similarly put at risk, whether or not they actually suffered injury. Thus, this conduct "signalled, or by itself constituted, a threat of 'continuing' criminal activity." *U.S. Textiles*, 911 F.2d at 1269.

The complexity and size of the scheme also favors a finding of continuity. The scheme involved the participation of several perpetrators—PIIGI, PAC, and the IBG defendants. It involved extensive planning and ongoing management to juggle incoming investor premiums for the EARs while paying out enough interest to keep the scheme afloat. It involved the use of sophisticated financial products, such as the ALFs. The participants made ongoing decisions not to fund the enhancements for the automobiles and to divert the payments to PAC's operations. Overall, through this scheme, PAC sold approximately $100 million in EARs with feature similar to those bought by Standard Federal. The complexity and sheer magnitude of the scheme therefore favors a finding of continuity.

Similarly, the nature of the scheme favors a finding of continuity. Where the scheme has a limited purpose, most courts have found no continuity. *See Sil–Flo*, 917 F.2d at 1516 (holding no closed-ended continuity where single scheme directed at "one discrete goal" and one victim); *Thompson v. Paasche*, 950 F.2d 306, 311 (6th Cir.1991) (holding no continuity where the defendant had nineteen lots to sell, and once he sold all of the lots, the scheme was over). Here, the jury could have found racketeering activity that had a broader goal—simply to defraud whatever financial institutions would purchase EARs. The scheme was limited only

by the ability of PIIGI, PAC, and the IGB defendants to keep it afloat; they had, for example, no finite number of lots to sell or single goal that would be accomplished in the near future. Given the scheme's duration and the extensiveness of the scheme, we find that there is sufficient evidence of closed-ended continuity to support the jury's finding of a pattern of racketeering acts.

We note that even if the evidence were insufficient to establish close-ended continuity, there would nevertheless be sufficient evidence to establish open-ended continuity. We measure continuity as of the time suit is filed. At the time suit was filed, PAC had not yet filed for bankruptcy, and the jury could have inferred that, as of that time, PAC was still not funding the promised enhancements and was still willing and capable of making sales using the deceptive summary sheet attached to the prospectus or similar deceptive practices. Thus, we hold that there was sufficient evidence of continuity to support the jury's finding that PIIGI engaged in a pattern of racketeering activity.

## IV. INCONSISTENCY OF VERDICTS

PIIGI next contends that the district court erred in refusing to grant it a new trial on the ground of an alleged inconsistency between the jury's verdict that PIIGI did not violate § 12(2) of the Securities Act and the jury verdicts finding liability on the three RICO fraud counts. Because we find that PIIGI waived this objection, we do not address the merits of the claim.

██ A failure to object to general jury verdicts on the ground of inconsistency before the jury is discharged constitutes waiver, unless the verdict is inconsistent on its face such that the entry of judgment upon the verdict is plain error. *Hinds v. General Motors Corp.*, 988 F.2d 1039, 1047 (10th Cir. 1993). However, when the verdicts are special verdicts a party is not required to object to the inconsistency before the jury is discharged in order to preserve that issue for a subsequent motion before the district court. *Bonin v. Tour West, Inc.*, 896 F.2d 1260, 1263 (10th Cir.1990).

██ We construe the verdicts here as general verdicts, rather than special verdicts,

because that construction is most consistent with the overall thrust of the verdicts and with the jury instructions that were given by the court. However, other than the verdict on Count 13, the language used in the verdicts is not precisely the language typically used in general verdicts.[11] The verdicts asked if PIIGI violated certain statutes, and

11. The verdicts submitted on PIIGI's liability read as follows:

\* \* \* \* \* \* \* \* \* \*

Do you find that defendant Professional Investors Insurance Group, Inc., has liability to the plaintiff under Count 13?

Yes _____ No X

3. Do you find defendant Professional Investors Insurance Group, Inc. has violated the provisions of the statutes as defined in these instructions in any one of the following counts?

| | | | | |
|---|---|---|---|---|
| Count 1 | (RICO fraud in the sale of securities) | Yes X | No | |
| Count 2 | (RICO conspiracy to commit fraud in the sale of securities) | Yes | No X | |
| Count 3 | (RICO fraud in the sale of securities) | Yes | No X | |
| Count 4 | (RICO conspiracy to commit fraud in the sale of securities) | Yes | No X | |
| Count 5 | (RICO wire fraud) | Yes X | No | |
| Count 6 | (Conspiracy to commit RICO wire fraud) | Yes | No X | |
| Count 7 | (RICO bank fraud) | Yes X | No | |
| Count 8 | (Conspiracy to commit RICO bank fraud) | Yes | No X | |
| Count 9 | (RICO interstate travel in execution of scheme to defraud) | Yes | No X | |
| Count 10 | (Conspiracy to commit RICO interstate travel in execution of scheme to defraud) | Yes | No X | |
| Count 14 | (Securities violation of § 12(2)) | Yes | No X | |

Later in the verdict form, one set of verdicts asked the jury to assess the plaintiff's damages:

If your answer to any of the questions numbered 2–8 is "yes", please answer the following questions:

9. What are the plaintiff's damages, if any, for violation of any of the following counts?

| | | |
|---|---|---|
| Count 1 | (RICO fraud in the sale of securities) | $200,000 |
| Count 2 | (RICO conspiracy to commit fraud in the sale of securities) | $ 0 |
| Count 3 | (RICO fraud in the sale of securities) | $100,000 |
| Count 4 | (RICO conspiracy to commit fraud in the sale of securities) | $ 0 |
| Count 5 | (RICO wire fraud) | $200,000 |
| Count 6 | (Conspiracy to commit RICO wire fraud) | $ 0 |
| Count 7 | (RICO bank fraud) | $200,000 |
| Count 8 | (Conspiracy to commit RICO bank fraud) | $ 0 |
| Count 9 | (RICO interstate travel in execution of scheme to defraud) | $100,000 |
| Count 10 | (Conspiracy to commit RICO interstate travel in execution of scheme to defraud) | $ 0 |
| Count 12 | (Securities violation of § 12(2)) | $ 0 |
| Count 14 | (Securities violation of § 12(2)) | $ 0 |
| Count 15 | (Fraud) | $1,500,000 |
| Count 14 | (Breach of fiduciary duty) | $500,000 |

that question is not necessarily synonymous with the issue of liability.

Nevertheless, when these verdict forms are considered with the jury instructions it is clear that they were, in fact, utilized as general verdicts. The jury was instructed that it had the responsibility to decide the case and that it had to return a verdict for the defendant on any count as to which the plaintiff failed to prove the material allegations in that count. The jury was instructed as to all of the elements of each count as well as the affirmative defenses. Other than the separate verdict form on damages, the jury received only a single verdict form for each count, and the instructions with regard to each count were in the context of what was required for the plaintiff to prevail or recover on such count. If the jury returned a verdict for the plaintiff on any of the listed counts it was instructed to proceed directly to the verdict on damages. The damages were to be entered for violation of specific counts. Thus, we have no difficulty here in concluding that these verdicts, considered as a whole and in conjunction with the jury instructions, were general verdicts. *See Lavoie v. Pacific Press & Shear Co.*, 975 F.2d 48, 54 (2d Cir.1992).

PIIGI has not pointed us to a place in the record where it lodged an objection to the alleged inconsistency before the jury was dismissed, and we have found none. We therefore must determine whether " 'the verdict is inconsistent on its face so that the entry of judgement on the verdict is plain error.' " *Hinds*, 988 F.2d at 1047 (quoting *Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.*, 791 F.2d 1416, 1424 (10th Cir.) (opinion of Barrett, J.), *cert. denied*, 479 U.S. 1007, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986)). "A verdict that resolves separate and distinct causes of action in favor of both parties is not inconsistent on its face." *Harris Market Research v. Marshall Marketing & Comm., Inc.*, 948 F.2d 1518, 1522 (10th Cir.1991). Here the alleged inconsistency was between verdicts that resolved separate and distinct causes of action—a § 12(2) claim under the Securities Act and three RICO claims (wire fraud, bank fraud, and securities fraud). We therefore hold that the finding of liability under the RICO fraud counts is not facially inconsistent with the finding of no liability under the § 12(2) count.[12] Given that there is no facial inconsistency between the verdicts, the district court could not be expected to notice, in the absence of an objection, that there was a potential inconsistency. PIGGI has therefore waived this objection because it was not raised prior to the discharge of the jury. *See Hinds*, 988 F.2d at 1047.

## V. QUESTIONING OF JURY FOREMAN

 PIIGI contends that the district court improperly questioned the jury about its verdict and that it is entitled to a new trial as a result. Rather than returning a verdict assessing a lump sum of damages, the jury assessed damages on each of the various counts on which it found liability. The RTC argued that the court should ask the jury if it intended that all of the damage awards be added to determine the total liability. Counsel for the Union Planters defendants contended that the total liability under the verdict was the largest damage award under a single count—which happened to be $1.5 million for the common law fraud charge. The court asked the jury foreman how properly to read the verdict:

> Was is [sic] it the jury's intention in awarding the damages that these are awarded separately and are to be added by the Court into a total, or that the total award from the defendants to the plaintiff is limited to $1,500,000 or that is only a component of the total and that all of the damages should be added together?

Tr. 2264. The foreman responded that the jury intended the damages assessments for all of the counts to be aggregated for the defendants' total liability.

On appeal, PIIGI contends that the district court erred in questioning the jury foreman, on the ground that it is improper to question a jury about its verdict.[13] We disagree.

---

**12.** We do not address whether the verdicts were, in fact, inconsistent.

**13.** The district court initially rejected the RTC's request that the court ask the jury how they

We do not believe that Fed.R.Evid. 606(b) prevents the district court from seeking clarification of this verdict, given the facts of this case.[14] Rule 606(b) forbids a juror from testifying as to matters occurring during deliberations or the juror's mental processes. However, we agree with the Second Circuit that Rule 606(b), by its own terms, is silent as to queries designed to confirm the accuracy of the verdict, and that the rule therefore does not preclude a juror from testifying as to the potential miscommunication of the verdict. *Attridge v. Cencorp Div. of Dover Tech. Int'l*, 836 F.2d 113, 116–17 (2d Cir. 1987); *see McCullough v. Consolidated Rail Corp.*, 937 F.2d 1167, 1172 (6th Cir.1991) (following *Attridge* and holding that where the district court merely asks for clarification of the final award, Rule 606(b) is not violated). In *Attridge*, the jury had mistakenly decreased the plaintiff's award by the amount of the plaintiff's fault, and the district court questioned the jurors as to their understanding of the verdict. 836 F.2d at 114–15.

We have previously suggested that a district court may question jurors to confirm their understanding of the verdict.[15] In *Eastridge Dev. Co. v. Halpert Assoc., Inc.*, 853 F.2d 772 (10th Cir.1988), the district court had questioned jurors about what they understood their verdict to mean. *Id.* at 783. We affirmed the district court's decision to

amend the verdict to reflect the jury's "true decision." Implicit in our decision in *Eastridge* is the notion that it is proper to question jurors to determine exactly what that "true decision" is.

The advisory note to Rule 606(b) also supports our reading of the rule. As the advisory committee observed, the rule against jurors impeaching their own verdict is designed to promote the jury's freedom of deliberation, the stability and finality of verdicts, and the protection of jurors against annoyance and embarrassment. Fed.R.Evid. 606(b), Advisory Committee Note (citing *McDonald v. Pless*, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915)). As the committee further observed, "[a]llowing [jurors] to testify as to matters other than their own inner reactions involves no particular hazard to the values sought to be protected."

The district court's decision to question the jury foreman as to the jury's "true decision" does not implicate any of the above concerns. Indeed, permitting questioning of jurors in limited instances such as the instant case promotes the value of judicial economy; otherwise, in the event of an ambiguity the court would be left with no other remedies than to order a new trial, even though a simple inquiry could clear up questions about how to read the damages verdict.[16]

intended to assess the damages. The court then excused PIIGI's counsel. After PIIGI's counsel had left, the court then began to reconsider asking the jury about the meaning of the verdict.

14. Fed.R.Evid. 606(b) reads in part:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. . . .

15. *Mid–West Underground Storage, Inc. v. Porter*, 717 F.2d 493 (10th Cir.1983), is not to the contrary. The *Mid–West* court was not confronted with the propriety of jury interrogation; rather, the issue there was whether the district court should have awarded a new trial because the jury's answers to special interrogatories appeared to contradict its damage award, but did not necessarily contradict it. 717 F.2d at 501. We held that a new trial was not required. We

had no occasion to address Rule 606(b). *Mid–West* quotes from *Chicago Rock Island & Pac. R.R. v. Speth*, 404 F.2d 291 (8th Cir.1968); however, the *Speth* court disapproved jury interrogation only in the context of a verdict that was neither apparently inconsistent nor potentially unclear. The questioning disapproved in *Speth* was questioning based simply upon the judge's belief that a verdict was too large or too small. *Id.* at 295. The *Speth* court did note that a district court could question the jury to correct the form of the verdict, *id.*, which arguably is all the district court did here.

16. PIIGI also argues that the procedure used to elicit the foreman's views was unfair and that the foreman's response was therefore "a nullity."

First, PIIGI asserts that the form of the district court's question was leading, because it listed the RTC's reading of the verdict twice. We do not believe that such a slip of the tongue rendered the question improperly leading, given that the foreman was clearly presented with the reading favored by PIIGI as well that favored by the RTC.

Second, PIIGI contends that the answer of the foreman could not alter the verdict of the entire

## VI. ALTER EGO INSTRUCTION

PIIGI next contends that the district court erred in refusing to clarify its alter ego instruction. The alter ego instruction given by the district court informed the jury that the Plaintiff claimed that defendants Union Planters National Bank and Union Planters Corporation were alter egos of Union Planters Investment Bankers Corporation, Union Planters Investment Bankers Group, Inc., and/or Investment Mortgage Corporation. The court instructed the jury that if it found these defendants to be alter egos, the jury could hold the alter ego corporations directly liable for the obligations of the corporations for which they were alter egos. PIIGI requested the district court to tell the jury that the alter ego doctrine did not apply to any relationship between PIIGI and PAC. The district court refused to give such an instruction because it said the introductory language of the instruction made it clear that it referred only to the Union Planters defendants. PIIGI now asserts that this was error.

 In reviewing jury instructions, "we consider all the jury heard, and from the standpoint of the jury, decide not whether the charge was faultless in every particular, but whether the jury was misled in any way and whether it had understanding of the issues and its duties to determine these issues." *Wheeler v. John Deere Co.*, 862 F.2d 1404, 1411 (10th Cir.1988) (quotation and citation omitted). Here, the instruction clearly indicated to the jury that the alter ego theory was not being applied to the relationship between PIIGI and PAC. The instruction listed all of the defendants to which the theory applied, and neither PIIGI nor PAC were among the defendants listed. We hold that the district court did not err in refusing to clarify further an already clear instruction on the applicability of the alter ego doctrine.

## VII. PAC AS AN INDISPENSABLE PARTY

 PIIGI finally contends that the district court erred in finding that PAC was not an indispensable party under Federal Rule of Civil Procedure 19(b). PAC, a subsidiary of PIIGI, was in bankruptcy at the time of trial and therefore suit against PAC was barred under the automatic stay. We review a district court's decision as to whether a party is indispensable for an abuse of discretion. *Navaho Tribe of Indians v. New Mexico*, 809 F.2d 1455, 1471 (10th Cir.1987). We hold that the district court did not abuse its discretion in refusing to dismiss the action for want of an indispensable party.

Here, PAC was alleged to have joint and several liability with PIGGI.[17] The plaintiff had the choice of suing PAC or PIIGI or both under the doctrine of joint and several liability. That only PIIGI could be sued due to PAC's bankruptcy does not render PAC an indispensable party, and the district court therefore did not abuse its discretion in refusing to dismiss the case under Rule 19(b).[18] *See Jett v. Phillips & Assoc.*, 439 F.2d 987, 990 (10th Cir.1971); *Lynch v. Johns–Manville Sales Corp.*, 710 F.2d 1194, 1198 (6th Cir.1983) (holding two potential defendants that were in bankruptcy at the time of trial were not indispensable parties requiring dismissal under Rule 19(b), because they were joint tortfeasors with the rest of the defendants); *Field v. Volkswagenwerk. AG*, 626 F.2d 293, 298 n. 7 (3d Cir.1980); Fed. R.Civ.P. 19. Advisory Committee Note to the Amended Rule (noting that Rule 19 does

jury. We note first that the rest of the jury indicated its agreement with the foreman's explanation of the meaning of the verdict. Second, the foreman's explanation here was only a clarification of the meaning of the verdict and not an impeachment of the verdict. *Sims' Crane Serv., Inc. v. Ideal Steel Prods., Inc.*, 800 F.2d 1553, 1555–56 & n. 10 (11th Cir.1986), upon which PIGGI seeks to rely, is therefore distinguishable.

17. *See Fleischhauer v. Feltner*, 879 F.2d 1290, 1301 (6th Cir.1989) (holding civil RICO damage awards are joint and several).

18. Even if we were to examine PAC's indispensability under the factors outlined in Rule 19(b) and *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 110, 88 S.Ct. 733, 738, 19 L.Ed.2d 936 (1968), we would hold that the district court did not abuse its discretion in finding that PAC was not an indispensable party requiring dismissal of the suit.

**1550**

not vary the "settled authorities" holding that a joint tortfeasor is merely a permissive party whose joinder is governed by Rule 20 (Permissive Joinder of Parties)); Charles A. Wright, et al., 7 Federal Practice and Procedure § 1622 at 342 (2d ed. 1986).

### CONCLUSION

We REVERSE the judgment holding PIIGI liable for RICO fraud in the sale of securities under Count 1. We AFFIRM the judgments finding PIIGI liable for RICO wire fraud and RICO bank fraud under Counts 5 and 7. We REMAND for the entry of a new judgment against PIIGI in accordance with this opinion.