**Gene MARSHALL, Plaintiff,**

v.

**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO, Defendant.**

**No. CIV–96–609–R.**

United States District Court,
W.D. Oklahoma.

Jan. 6, 1998.

---

Emmanuel E. Edem, Nicole M. Vernier–Gelven, Norman, Edem, McNaughton & Wallace, Larry D. Muse, Larry D. Muse & Assoc., Oklahoma City, OK, for Gene Marshall, plaintiff .

Thomas P. Howell, IV, Joe E. Edwards, Ricki V. Sonders, Day, Edwards, Federman, Propester & Christensen, Oklahoma City, OK, Joe Goldberg, American Federation of Government Employees, General Counsel, Washington, DC, for American Federation of Government Employees, AFL–CIO, John Sturdivant, defendants.

## *ORDER*

DAVID L. RUSSELL, Chief Judge.

Before the Court is "Plaintiff's Motion for Summary Judgment Regarding Defendants' Amended Counterclaim." Since the filing of this motion, the parties have stipulated to the dismissal with prejudice of Plaintiff's claims against Defendant John Sturdivant and the Court has granted the motion of American Federation of Government Employees, AFL–CIO ("AFGE"), for summary judgment on Plaintiff's Amended Complaint. Accordingly, AFGE is now the Plaintiff herein on which claims Gene Marshall, who is now the Defendant, seeks summary judgment. To avoid any possible confusion as a result of these developments, however, the Court will simply refer to the parties as "Marshall" and "AFGE" and to what were AFGE's counterclaims as its claims.

Marshall seeks summary judgment on AFGE's claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, on grounds that 1) that claim is barred by the four-year statute of limitations; 2) there are no facts to support it; 3) no private cause of action for mail fraud exists and therefore no private cause of action under RICO utilizing mail fraud as racketeering activity exists; 4) there is no factually-based scheme because Local 916 and the Foundation were separate legal entities, the separate financial activities of which and separate reporting thereof were proper, Local 916 was not entitled to profits earned by Foundation using other entities' bingo licenses and the Foundation as a separate entity was not required to obtain the union's approval to refinance its property or make capital improvements thereto; 5) AFGE has not alleged and cannot prove the existence of a "pattern" of racketeering because the acts alleged or shown do not amount to or pose a threat of continued criminal activity, and, in any event, there is

no proof of any specific mailings by Marshall or that he engaged in any fraud and Marshall did in fact turn over the books and records of the Foundation when he resigned in April of 1993; and 6) since Wallace had no facts to support any of the allegations, Local 916 and the Foundation could not have assigned *any* claim to AFGE.

Marshall's statute of limitations argument, as the Court understands it, is really twofold. First, he asserts, based on the undisputed fact that his term as President of Local 916 ended in December of 1992, when he was not re-elected, that the statute of limitations on a RICO claim began to run at that time and ran in December of 1996. Since the claims of Local 916 against Marshall were not even assigned until March of 1997, the RICO claim is barred by the statute of limitations. Secondly, Marshall asserts that "the basic premise of the claims alleged in the Defendants' counterclaim is the same as charges alleged in the Petition filed by Larry Wallace, President of AFGE Local 916, as a member and on behalf of the Foundation against Mr. Marshall." Marshall's Brief at p. 9. Since the case brought by Wallace was dismissed on October 27, 1994, Marshall implies, but does not specifically say in connection with the RICO claim, that pursuant to Okla. Stat. tit. 12, § 100, AFGE's claim is barred by res judicata or collateral estoppel and/or the statute of limitations because it was not filed by October 27, 1995.

■ AFGE does *not* rely on Okla. Stat. tit. 12, § 100 and the suit brought by Larry Wallace as a member and on behalf of the Foundation to avoid the bar of the statute of limitations. Marshall cannot use Okla. Stat. tit. 12, § 100 as "sword" herein merely because AFGE's RICO claims and claims made on behalf of the Foundation in Wallace's suit arise from the same operative facts. AFGE would be bound by what occurred in Wallace's suit only to the extent claim or issue preclusion would apply and neither does because either requires, among other things, a judgment on the merits in the prior case.[1] *See Fox v. Maulding,* 112 F.3d 453, 456 (10th

Cir.1997); *King v. Union Oil Company of California,* 117 F.3d 443, 445 (10th Cir.1997); *Petromanagement Corp. v. Acme–Thomas Joint Venture,* 835 F.2d 1329, 1335–37 (10th Cir.1988).

■ A civil RICO cause of action, which is subject to a four-year statute of limitations, *see Agency Holding Corp. v. Malley–Duff & Associates, Inc.,* 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121, 134 (1987), accrues as soon as the plaintiff discovers or reasonably should discover both the existence and source of his injury and that the injury is part of a pattern. *Bath v. Bushkin, Gaims, Gaines, & Jonas,* 913 F.2d 817, 820 (10th Cir.1990). Marshall asserts that the RICO claim accrued when Marshall's term as President of Local 916 ended in December of 1992 but, as AFGE points out, AFGE's RICO claim is based upon Marshall's alleged conduct of the affairs of the Foundation, alleged to be the RICO "enterprise," through a pattern of racketeering activity that caused injury to the business and property of Local 916, which claim was assigned to AFGE, and AFGE has submitted evidence which is uncontroverted that Marshall did not resign as Chairman of the Board of Foundation until April 20, 1993 and that he did turn over books and records of the Foundation, including its accounting records for the last quarter and its general ledger, until after July 29, 1993. It may reasonably be inferred from this and other evidence before the Court, *see* Transcript Excerpt Investigative Hearing (Testimony of Casey Russell) at 423–26, 428–29 & 710–14 and Affidavit of David R. Payne (Exhibit "10" to Defendants' Brief) at ¶¶ 5–10, that the local union could not reasonably have discovered the existence, source and extent of its injury and that the injury was the result of a pattern of racketeering activity until April 20, 1993 or until after July 29, 1993. AFGE filed its RICO counterclaim on April 18, 1997, having received an assignment of all of the local union's claims in March of 1997. Thus genuine issues of material fact exist as to whether AFGE's RICO

---

1. Moreover, the Oklahoma savings statute would not even be operative unless the statute of limitations on a RICO claim arising from the same

operative facts had run prior to dismissal of Wallace's suit, which it had not. See *infra* at pp. 3–4 & p. 16.

claim is barred by the statute of limitations because reasonable jurors could find from evidence before the Court that the local union could not reasonably have made the discovery necessary to accrual of a RICO cause of action until less than four years before the RICO counterclaim was brought by AFGE.

Marshall's argument that there are no facts to support AFGE's RICO claim based upon the lack of knowledge of Larry Wallace, President of AFGE Local 916, of any facts to support it is unavailing because AFGE has submitted evidence from other sources to support its RICO claim.

Marshall's argument that mail fraud cannot serve as a predicate for a RICO claim because there is no private cause of action for mail fraud is patently frivolous. Mere reference to the RICO statutes would have informed Marshall's counsel that "racketeering activity" specifically includes any act indictable under 18 U.S.C. § 1341, i.e., mail fraud. 18 U.S.C. § 1961(1)(B).

■ AFGE alleges a scheme by the Foundation to divert the benefit of the Foundation's bingo operations from Local 916 and its members, Amended Counterclaim at ¶ 9(a), which was effected by, among other things, financial deconsolidation of Local 916 and the Foundation. *Id.* at ¶ 9(B). Marshall essentially argues that the acts alleged by AFGE do not amount to or cannot form the basis for a scheme to defraud because Local 916 and the Foundation were separate entities. Because they were separate entities, Marshall argues, the Foundation didn't need the approval of Local 916 or its members as to the use of profits from Foundation's bingo operations, could refinance property owned by it without AFGE's approval and never should have been consolidated for financial reporting or on any basis with Local 916. However, it may reasonably be inferred from evidence before the Court that the Foundation was formed solely for the purpose of holding legal title to the real property which belonged to Local 916; that the Foundation was created by Local 916 for the exclusive benefit of the members of Local 916, membership in the Foundation, a non-stock corporation, was limited to members of Local 916 and its directors were the members of the Executive Council of Local 916; that the Foundation utilized the bingo license of Local 916 to run bingo games at the property equitably owned by Local 916, title to which was held by Foundation, for or ostensibly for the benefit of Local 916; that thereafter Marshall and others without the approval or knowledge of the members of Local 916 or a quorum thereof amended the bylaws of the Foundation to open the membership to the general public and provide that the officers of Local 916 would not automatically be the officers of the Foundation for the purpose of obtaining tax-exempt status from the IRS so that the Foundation could get its own bingo license; and that thereafter, the Foundation utilized the bingo licenses of Local 916, the Foundation and other entitles and Local 916 did not obtain the benefit of even the net profits of Foundation's bingo operations carried on on the local's own license and/or of its operations carried on using Foundation's or others bingo licenses. In short, there is evidence in the record from which reasonable jurors could find that although Foundation was always a nominally separate legal entity from Local 916, it was created as a corporate shell simply to hold legal title to real property which, under Oklahoma law, Local 916 could not hold, for the sole and exclusive membership of Local 916 and that its members and officers were those of Local 916, and that the actions of Marshall and others to change the bylaws and hence the Foundation's membership and officers to obtain tax-exempt status and Foundation's own bingo license were done without authority and for the purpose of depriving Local 916 of the benefit of Foundation's bingo operations. Moreover, reasonable jurors could find from evidence before the Court that Marshall decided to decombine the reporting of the financial activities of Local 916 and the Foundation; that after that change, reports given to Local 916 membership did not disclose either gross revenues from bingo operations run by Foundation on the local union's license or expenses deducted therefrom; that the change in accounting practice adversely affected the ability of Local 916 to be informed of the Foundation's activities, see Deposition of Gene Marshall (Exhibit "15" to Defendants' Brief) at pp. 261–69; and that

Marshall effected financial deconsolidation to deceive Local 916, to enable Foundation to divert the profits from Foundation's bingo operations to Foundation and to conceal same from Local 916. Thus, reasonable jurors could find and infer from evidence before the Court the existence of a scheme to defraud and that Marshall intended to defraud Local 916 through the use of Foundation.

Marshall asserts that the predicate acts of racketeering alleged by AFGE do not satisfy or cannot meet the continuity requirement of a pattern because the scheme alleged is not sufficiently extensive, considering the factors of the number of victims, the number of racketeering acts, the number of distinct injuries, the size and complexity of the scheme and the nature or character of the enterprise or unlawful activity, *see Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1543 (10th Cir.1993), and because the predicate acts of mail fraud do not "amount to or pose a threat of continued criminal activity," *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195, 208 (1989), so as to satisfy the durational aspect of a pattern. *See Resolution Trust Corp. v. Stone*, 998 F.2d at 1543 & 1544. Moreover, Marshall argues that AFGE has not alleged or cannot show a "pattern" of mail fraud because AFGE has "no proof as to any specific dates in which ... Marshall supposedly mailed the items enumerated in [the] claim of racketeering activity," Marshall's Amended Brief at p. 16; "there is no proof that Mr. Marshall engaged in any instance of fraud," *id.* at 17; and, in any event, "a multiplicity of mailings does not necessarily amount to a pattern of racketeering activity," *id.* at pp. 15–16, *citing Bajorat v. Columbia–Breckenridge Development Corp.*, 944 F.Supp. 1371, 1378 (N.D.Ill.1996).

AFGE in response asserts that it has alleged in paragraphs 9 and 10 of its Amended Counterclaim a scheme and series of predicate acts by Marshall which lasted from early 1991 through December of 1992 which are sufficient to establish or support a finding of closed-ended continuity. AFGE points to the Affidavit of David R. Payne (Exhibit "10" to AFGE's Brief), to Local 916's LM Reports to the Department of Labor signed by Marshall and caused to be mailed by him, e.g., Exhibit "17" to AFGE's Brief, and tax returns of Local 916 signed by Marshall caused to mailed by him, e.g. Local 916's Form 990 for 1991, Exhibit "19" to AFGE's Brief, to show a pattern of mail fraud.

In its amended RICO counterclaim, AFGE alleges that the Foundation is an "enterprise" as defined in RICO, see Amended Counterclaim at ¶ 8; that Marshall is the "person" who violated 18 U.S.C. § 1962(c), *see id.* at ¶ 10; and that "[c]ommencing in 1991, *the Foundation* undertook a scheme to divert the benefit of the Foundation's bingo gaming operations from Local 916 and its members," *id.* at ¶ 9(A). AFGE further alleges that "Marshall, as Chairman of the Foundation and President of Local 916, caused the financial activities of the Foundation to be deconsolidated from the financial activities of Local 916," *id.* at ¶ 9(B), as a consequence of which the Foundation deprived Local 916 and its members of material financial facts concerning the results and profits of Foundation's bingo operations under Local 916's license and under the bingo licenses of other license holders, *id.* at ¶ 9(C), and concealed various financial activities of Foundation from Local 916 and its members, including its diversion of profits from the operation of Local 916's bingo license to uses other than the benefit of Local 916 and its members, including to other bingo license holders, its refinancing of property equitably owned by Local 916 and use of the proceeds thereof otherwise than for the benefit of Local 916 without the approval of its membership, and its subtraction of overhead expenses from the gross profits of operation of Local 916's bingo license, etc., *see id.* at ¶ 9(D). AFGE further alleges that Marshall, as Chairman of the Foundation and President of Local 916, caused mailings itemized in subparagraphs (A), (B) and (C) of paragraph 10 of the Amended Counterclaim, each of which mailing AFGE alleges "being an act of mail fraud within the meaning of 18 U.S.C. § 1341," "in furtherance of the scheme discussed in Paragraph 9 ... [of the Amended Counterclaim], in violation of 18 U.S.C. § 1962(C)." *Id.* at ¶ 10. In other words, AFGE alleges that Marshall conducted or

participated, directly or indirectly, in the conduct of Foundation's affairs through a pattern of the racketeering activity of mail fraud. The mail fraud consisted of a scheme devised by Marshall to defraud Local 916 and its members by concealing financial information and Foundation's financial activities from Local 916 and its members, which scheme amounted to or was accomplished by deconsolidating the financial activities of Foundation and Local 916, and the mailings alleged by AFGE allegedly caused to be made by Marshall for the purpose of furthering the scheme. In summary, then, AFGE's allegations of a pattern of racketeering activity through which Marshall allegedly conducted the affairs of Foundation consisting of *one* scheme to defraud—to conceal financial information and Foundation's financial activities from Local 916 and its members through financial deconsolidation—and the mailings allegedly caused to be done by Marshall pursuant to that scheme "[f]or the period 1991 through December of 1992." Amended Counterclaim at ¶ 10.

■ AFGE understands Marshall's arguments directed to the pattern and mailings elements of AFGE's RICO claim as, among other things, an attack on the sufficiency of the evidence, as does the Court, but the only evidence of mailings submitted by AFGE are the following: 1) Labor Organization *Annual* Report Form LM–2 for Local 916 signed by Marshall and dated April 1, 1992 (Exhibit "17" to AFGE's Brief); and 2) Tax Return of Organization Exempt from Income Tax for Local 916 dated March 31, 1991, prepared and signed by Casey J. Russell, CPA, which AFGE states Marshall caused to be filed by mail. AFGE implies that these mailings furthered the scheme of concealing Foundation's financial activities from Local 916 and financial information from Local 916 and its members because "even publicly available records [Local 916's annual LM–2 Report and tax return] would not aid the membership of Local 916 in learning what Marshall was doing through the Foundation." AFGE's Brief at p. 17. In addition, AFGE refers to Karen Moore's testimony to the effect that "the Foundation received its bank statements by mail, it sent and received mail most every

business day, every time they paid a food or supply bill, and every month when a state sales tax report was due," *id.*, but AFGE does not explain how such mailings furthered, advanced or carried out the alleged scheme to defraud by concealment of financial information and activities through financial deconsolidation. That such uses of the mails furthered the scheme in some way is not reasonably inferable. Thus, AFGE has submitted evidence of the use of the mails by Local 916 on two occasions approximately one year apart, which use of the mails, the Court will presume, was caused by Marshall. But even if it can be inferred that these mailings furthered, advanced or carried out in some way a scheme to conceal financial information and Foundation's financial activities from Local 916, the single scheme to defraud and two mailings approximately one year apart for the purpose of furthering that scheme do not constitute a pattern of racketeering activity, that is, a pattern of mail fraud, as a matter of law. Moreover, even if the scheme and two mailings by Local 916 of forms required by law to be filed by it could constitute a pattern of racketeering activity, that is, a pattern of mail fraud, it cannot be said that Marshall conducted the affairs of Foundation through that pattern of mail fraud when the mailings were those of Local 916 and the information contained in the reports that were mailed was a product or consequence of a single decision to deconsolidate the financial activities of Local 916 and Foundation. This is perhaps but another way of saying that the alleged scheme to conceal financial information and the financial activities of Foundation from Local 916 and its members was effected or completed by the decision to deconsolidate Foundation's financial activities from the financial activities of Local 916, i.e., a change in accounting practice, and once that decision was made, the scheme of concealment was complete and the alleged mailings did nothing to further, advance or carry out a scheme of concealment, but were a logical result or product of that scheme which was wholly accomplished or completed by the decision to deconsolidate the financial activities of Foundation and Lo-

cal 916 or a change in accounting practices.[2]

AFGE argues that it has alleged and shown closed-ended continuity but two mailings approximately one year apart pursuant to one "scheme" and which are really a result or product of one decision do not constitute a "series of related [predicate acts of mail fraud] extending over a substantial period of time" exceeding a few weeks or months, *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2902, 106 L.Ed.2d 195, 209 (1989); *see Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1543–44 (10th Cir. 1993), which threatened or posed the threat of future criminal conduct, even though that threat was not realized due to Marshall's loss of the election in December of 1992 and his resignation from the Foundation in April of 1993. This is particularly true when the extensiveness of the alleged RICO enterprise's scheme or unlawful activity is considered in light of the factors described in *Resolution Trust Corp. v. Stone*, 998 F.2d at 1543–44. The scheme or illegal activity alleged by AFGE had but one victim, Local 916, the number of racketeering acts is at best two, only one type of racketeering act, mail fraud, is alleged, the injury or injuries to Local No. 916 may reasonably be viewed either as one injury (concealment which permitted Foundation to divert profits) or as multiple distinct injuries, the complexity and size of the alleged scheme was de minimis and was or could be accomplished by an accounting practice change, and the nature or character of the alleged unlawful activity—concealment of financial information and the financial activities of Foundation from Local 916 and its members—was such that it had no apparent termination date but the scheme was apparently completed absent intervening circumstances upon effecting a change in accounting practices. In short, when the number and duration of the alleged predicate acts of which AFGE has submitted evidence are considered in conjunction with the extensiveness of the alleged scheme,

"with the goal of achieving a 'natural and commonsense result,'" *Resolution Trust Corp. v. Stone*, 998 F.2d at 1544, *quoting U.S. Textiles, Inc. v. Anheuser–Busch Companies, Inc.*, 911 F.2d 1261, 1267 (7th Cir. 1990), the Court concludes that AFGE has failed to submit evidence of a pattern of racketeering activity through which Marshall conducted or participated in conducting, directly or indirectly, the affairs of Foundation as a matter of law, that is, evidence from which reasonable jurors could so find. Thus, Marshall is entitled to summary judgment on AFGE's RICO claim and the Court need not consider Marshall's other arguments in support of his motion addressed to the RICO claim.

■ Marshall's arguments that AFGE's breach of contract claim is barred by the statute of limitations by operation of res judicata or collateral estoppel; that AFGE has no evidence to support this claim and/or that Local 916 could not validly assign this claim because Larry Wallace, Marshall's successor as President of Local 916, has admitted that he has no facts and never knew any facts on which to predicate the claims for breach of contract asserted by AFGE herein; and that Marshall did not breach any contractual obligations by doing the things alleged in AFGE's breach of contract claim without the approval of the membership of Local 916 because Local 916 and the Foundation were separate entities, such that approval of Local 916's membership was not required for actions taken by Marshall on behalf of the Foundation, have already been disposed of in connection with the RICO claim, *supra*. The bar of the applicable statute of limitations is an affirmative defense which Marshall has the burden of proving. Since Marshall has failed to show that Local 916 (and hence AFGE, by assignment) is in privity with the Foundation and bound by what occurred in the suit brought by Wallace as a member of and on behalf of the Foundation against Marshall, Marshall is not enti-

**2.** Proof of mail fraud requires proof of 1) the existence of a scheme to defraud and 2) the mailing of a letter or other relevant item for the purpose of furthering the scheme. *See, e.g., United States v. Hanson*, 41 F.3d 580, 583 (10th Cir.1994). When a fraudulent scheme has reached fruition, mailings thereafter cannot be said to be for the purpose of executing the scheme and thus do not satisfy the second required element of mail fraud. *See United States v. Cardall*, 885 F.2d 656, 680–82 (10th Cir.1989) and cases cited therein.

tled to summary judgment on the breach of contract claim on the ground that the claim is barred by the statute of limitations.[3] It does not matter that Larry Wallace, current President of Local 916, does not have any facts to support AFGE's breach of contract claim and never did have any because breach of contract claims may be assigned and Local 916 validly assigned "[a]ll claims of whatsoever nature, except those Retained Claims" which Local 916 had against Marshall, "whether known or unknown ... arising out of or relating to," inter alia, "Marshall's violation of any express or implied contract between Marshall and Assignor [Local 916] or among Marshall, Assignor and others" and "Marshall's violation of any provision of Assignor's Constitution" or "of Assignor's By-laws," Absolute Assignment from Local 916 to AFGE dated March 6, 1997 (Exhibit "15" to AFGE's Brief); and there is other evidence before the Court from which reasonable jurors could find that Marshall breached provisions of the constitution and bylaws of Local 916, which documents constitute a written contract between Marshall and Local 916, *see, e.g., Korzen v. Local Union 705,* 75 F.3d 285, 288 (7th Cir.1996); *Doty v. Sewall,* 908 F.2d 1053, 1060 (1st Cir.1990); *Gray v. International Association of Heat & Frost Insulators and Asbestos Workers, Local No. 51,* 447 F.2d 1118, 1121 (6th Cir. 1971), and that Local 916 sustained damages as a result of the breach or breaches. · As to Marshall's argument predicated on the assertion that Local 916 and the Foundation were separate entities, reasonable jurors could find that Local 916 never intended that the Foundation would have any function other than that of holding bare legal title to Local 916's property or any management separate from Local 916's management and that the purported amendment of Foundation's bylaws by Marshall and others, by which membership in the Foundation was opened to the general public and Foundation's management was unlinked from Local 916's management, was itself a breach of Marshall's contractual and fiduciary duties.

*See, e.g.* Local 916 Constitution, Article VI, Sec. 2.

Marshall argues that he is entitled to summary judgment on AFGE's claim for breach of fiduciary duty because that claim is barred by the statute of limitations in light of the fact that the case filed by Wallace, for and on behalf of the Foundation, was dismissed on October 27, 1994 for failure to prosecute and was not refiled within the time provided by Okla. Stat. tit. 12, § 100. Marshall also asserts that he is entitled to summary judgment on the grounds that Mr. Wallace has no facts and never had any facts to support the claims made herein and that no breach of fiduciary duties can have occurred because Local 916 and the Foundation were separate entities.

The applicable statute of limitations for a breach of a fiduciary duty or duties which are *ex contractu,* that is, arise from a written contract, such as the duties allegedly breached herein, is five years as provided in Okla. Stat. tit. 12, § 95(10), previously set forth in Okla. Stat. tit. 12, § 95(9). *See Chickasaw Tel. Co. v. Southwestern Bell Mobile Systems, Inc.,* 113 F.3d 1245 (10th Cir.1997) (table; unpublished) (1997 WL 290951) (copy attached), citing at p. 8, n. 4, *Bechler v. Kaye,* 222 F.2d 216, 220 (10th Cir.1955). As of October 27, 1994, when Larry Wallace's action brought for and on behalf of the Foundation was dismissed for failure to prosecute, the breach of fiduciary duty claims were not time-barred by the five-year statute of limitations. Accordingly, the savings statute, Okla. Stat. tit. 12, § 100, is not even operative and neither served to save a time-barred claim of Wallace on behalf of Foundation nor does it bar AFGE's claim for breach of fiduciary duties assigned to it by Foundation. *See Grider v. USX Corp.,* 847 P.2d 779, 783 (Okla.1993); *Ross v. Kelsey,* 825 P.2d 1273, 1279 (Okla.1991). Thus, Marshall is not entitled to summary judgment on AFGE's claim for breach of fiduciary duties on statute-of-limitations grounds on the basis of *this* argu-

---

**3.** *See also* note 1, *supra,* and text at p. 16, *infra.* It may well be that the bar of the statute of limitations is a valid defense to AFGE's breach of contract claim but Marshall has failed to show by

the argument he makes to support his motion for summary judgment that the claim is barred by the statute of limitations.

ment.[4] Marshall's arguments that Wallace had and has no facts to support these claims and that no breach of fiduciary duties can have occurred due to the fact that Local 916 and the Foundation are separate entities are unavailing here for essentially the same reasons that those arguments were not dispositive of other claims asserted by AFGE, *see supra.*

Marshall makes the same arguments made with respect to other claims herein—that the claim is barred by the statute of limitation by virtue of Wallace's prior suit and operation of Okla. Stat. tit. 12, § 100, and that Larry Wallace had and has no facts to support the claim—to support his motion for summary judgment directed to AFGE's claim for breach of Oklahoma corporate and statutory law. In addition, he asserts that AFGE has failed to allege any violation of Oklahoma corporate or statutory law.

█ The Court agrees with Marshall that AFGE has failed to state a claim for violation of corporate and statutory law on which relief can be granted. AFGE argues that Marshall's purported amendment of the Foundation's bylaws was in violation of Marshall's contract with the Foundation, the contract being the written charter and bylaws of the Foundation, and of Sections 1013 and 1028(B) of Title 18 of the Oklahoma Statutes. That may be and the Foundation and now AFGE by assignment may have a claim for breach of contract based on this conduct, an issue on which the Court expresses no opinion, but AFGE has failed to point to any authority, and the Court has found none, indicating that a violation of the cited statutes gives rise to a private right of action for damages. Neither of the statutes which AFGE cites reveal any explicit or implied intent by the Oklahoma Legislature to create a private cause of action or remedy. *See Holbert v. Echeverria,* 744 P.2d 960, 962–65 (Okla.1987) (three-pronged test for implying private right of action from a regulatory or public-law statute). *See also Jennings v. Globe Life &*

*Accident Insurance Company of Oklahoma,* 922 P.2d 622, 625 (Okla.1996); *Nichols Hills Physical Therapy v. Guthrie,* 900 P.2d 1024, 1026 (Okla.App. Div. 4 1995). Accordingly, Marshall is entitled to summary dismissal of this claim.

AFGE has now dismissed its abuse of process claim. Thus, it is unnecessary for the Court to consider Marshall's motion directed to that claim.

Gene Marshall's motion for summary judgment on the counterclaims, now claims, of American Federation of Government Employees, AFL–CIO, is granted in part and denied in part. His motion for summary judgment on AFGE's claims under RICO and for violation of Oklahoma corporate and statutory law is granted. In all other respects Marshall's motion for summary judgment is denied.

## APPENDIX

CHICKASAW TELEPHONE COMPANY, an Oklahoma corporation, and Chickasaw Cellular Company, an Oklahoma corporation, Plaintiffs-Appellants,

v.

SOUTHWESTERN BELL MOBILE SYSTEMS, INC., a Delaware and Virginia corporation, Defendant–Appellee.

No. 96-6357

United States Court of Appeals, Tenth Circuit.

May 27, 1997.

Before PORFILIO, ANDERSON, and BRORBY, Circuit Judges.

### ORDER AND JUDGMENT*

Chickasaw Telephone Company and Chickasaw Cellular Company ("Chickasaw") appeal the district court's order granting summary

---

4. Again, Marshall may have a valid statute-of-limitations defense but Marshall has failed to show based on the argument made that this claim is barred by the statute of limitations.

* This order and judgment is not binding precedent, except under the doctrines of law of the

case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir.R. 36.3.

judgment in favor of defendant Southwestern Bell Mobile Systems, Inc. ("Southwestern Bell"). The district court, exercising diversity jurisdiction, determined that Chickasaw's claims were filed outside Oklahoma's applicable statutes of limitations for actions on written contracts and for breach of fiduciary duty, and therefore, that Southwestern Bell was entitled to judgment as a matter of law. We affirm.

## I.  BACKGROUND

In June 1984, Chickasaw, Southwestern Bell, and two other parties entered a written agreement establishing the Oklahoma City SMSA Limited partnership to fund, establish, and provide cellular telecommunications service to the Oklahoma City Standard metropolitan Statistical Area (SMSA) Appellant's App. at 297–98 (Partnership Agreement). Southwestern Bell is the general partner and a limited partner, while Chickasaw is a limited partner. The partnership agreement includes a paragraph concerning the provision of cellular service to rural service areas (RSAs) adjoining the Oklahoma City SMSA. That paragraph provides:

> Nothing herein shall preclude the General partner or an Affiliate thereof from providing Cellular Service independently from the Partnership in areas other than the SMSA and adjoining areas. Applications by the General Partner or an Affiliate thereof to provide Cellular Service in areas adjoining the SMSA shall be deemed to be made on behalf of the Partnership pursuant to the terms of Section 7.2(f).[1]

*Id.* at 318, ¶ 8.8. The partnership agreement also requires Southwestern Bell, as the general partner, to act at all times in the part-

nership's best interest (section 8.1) and to distribute partnership funds quarterly (section 6.3).

In a letter dated October 18, 1988, Southwestern Bell informed Chickasaw that it would "file applications for the RSAs adjoining the Oklahoma service areas in its own name and on its own behalf," not on behalf of the partnership. Appellant's App. at 380. On October 19, 1988, Southwestern Bell filed with the FCC its application to provide cellular service in three RSAs adjoining the Oklahoma City SMSA (FCC application). On the FCC application, Southwestern Bell disclosed its interest in the Oklahoma City SMSA Limited Partnership, and its belief that it was not required to apply on the partnership's behalf. *Id.* at 22, 27–29. Southwestern Bell subsequently received the right to provide cellular service in these three RSAs.[2]

Chickasaw objected to Southwestern Bell's FCC application on its own behalf insisting that it had "carry-on" rights to the RSAs.[3] Counsel for Chickasaw sent Southwestern Bell four letters in October 1988, September 1989, October 1990, and July 1991, all asserting that the FCC application should "be deemed to be made on behalf of the Partnership." *Id.* at 381–88. The record contains no written responses to these letters from Southwestern Bell. However, Chickasaw Holding Company's Executive Vice President alleged, in an affidavit, that from 1988 to at least November 1991, there were ongoing negotiations concerning the unresolved issue of Chickasaw's carry-on rights in the RSAs, and that not until a November 7, 1991, meeting did Southwestern Bell communicate its intention not to honor Chickasaw's asserted rights. Appellant's App. at 287, 290.

On June 7, 1996, Chickasaw filed its complaint alleging that Southwestern Bell "has

---

**1.** Section 7.1(f) of the agreement grants the general partner authority to "apply to the FCC on behalf of the Partnership for permits and licenses to provide Cellular Service in counties contiguous to the SMSA."

**2.** Neither the parties nor the record indicate when Southwestern Bell received the right to provide cellular services to these RSAs. However, in a letter to Southwestern Bell dated October 2, 1990, counsel for Chickasaw stated, "we understand that [Southwestern Bell] did file applications and subsequently obtained interests in

markets contiguous to Oklahoma City." *Id.* at 386. Thus, it appears from this correspondence that Southwestern Bell received the rights to these RSAs, and Chickasaw was aware of that fact, at least by October 2, 1990.

**3.** Carry-on rights refer simply to "the rights granted to the limited partners ... to participate in the provision of cellular service in areas adjoining the Oklahoma City MSA." Appellant's App. at 287.

breached, and continues to breach," both the partnership agreement and its fiduciary duty to Chickasaw, by refusing to acknowledge that its FCC applications were on behalf of the partnership, and by refusing to share the benefits of those applications with Chickasaw. *Id.* at 3, 4. In response, Southwestern Bell filed a motion for summary judgment, arguing that Chickasaw's claims were barred by the applicable five-year statutes of limitations, an affirmative defense which Southwestern Bell raised in its answer. Chickasaw responded that Southwestern Bell was in continuous breach of the agreement and its fiduciary duty, so the statutes of limitations do not bar Chickasaw's claims.

The district court held that Chickasaw's claims were barred by the statutes of limitations because they accrued in october 1988, or at the latest on October 2, 1990, "when Chickasaw's own correspondence reflects it was aware of the claims it is asserting in this case." *Id.* at 401 (Summary Judgment Order). The court also rejected "Chickasaw's attempt to escape the limitations bar by arguing a 'continuing wrong,'" *id.*, agreeing with Southwestern Bell that the act of filing the FCC application constituted the breach, while subsequent injuries are merely damages from that breach.

On appeal, Chickasaw argues that the district court erred in granting summary judgment because it failed to recognize the uncontroverted evidence of the continuing nature of Southwestern Bell's breaches. Appellant's Br. at 10. Alternatively, Chickasaw argues that even if Southwestern Bell's boundaries are not continuing, Chickasaw's claims are not barred because Southwestern Bell did not repudiate its obligations and fiduciary duties under the partnership agreement until November 7, 1991, within the five-year limitations period. *Id.* at 20.

## II. DISCUSSION

We review an order granting summary judgment *de novo, Yoder v. Honeywell, Inc.,* 104 F.3d 1215, 1219 (10th Cir.1997), applying the same standard as the district court, i.e., summary judgment is appropriate when the court finds that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kaul v. Stephan,* 83 F.3d 1208, 1212 (10th Cir.1996) (quoting *Wolf v. Prudential Ins. Co. of America,* 50 F.3d 793, 796 (10th Cir.1995)). We may affirm on grounds not relied upon by the district court. *United States v. Sandoval,* 29 F.3d 537, 542 n. 6 (10th Cir.1994).

The primary issues presented on appeal are whether, under the Oklahoma City SMSA Limited partnership agreement, Southwestern Bell's actions constituted: (1) continuing breaches of its written contractual obligations; and (2) continuous tortious breaches of its fiduciary duties, thereby bringing Chickasaw's claims within the statutes of limitations. In order to determine whether the Oklahoma statutes of limitations bar Chickasaw's claims in this diversity action, we must determine when the claims accrued. In Oklahoma, "[t]he temporal point of a claim's accrual is dependent upon (a) the nature of the right in litigation and (b) when the plaintiff could have first effectively maintained the action." *Resolution Trust Corp. v. Greer,* 911 P.2d 257, 261 (Okla.1995).

The parties do not dispute the applicable statutes of limitations. In Oklahoma, a civil action "upon any contract, agreement, or promise in writing," must be brought within five years "after the cause of action shall have accrued, and not afterwards." Okla. Stat. tit. 12, § 95(1). A tort action for breach of fiduciary duty arising out of a contract falls under the five-year catchall statute of limitations in Okla.Stat. tit. 12, § 95(9).[4]

---

4. The district court held, and the parties agree, that Chickasaw's breach of fiduciary duty claim is a tort action arising out of a contract. This action is therefore governed by the catchall statute of limitation in section 95(9) which provides: "An action for relief, not hereinbefore provided for, can only be brought within five (5) years after the cause of action shall have accrued."

See *Bechler v. Kaye,* 222 F.2d 216, 220 (10th Cir.1995) (applying Oklahoma catchall statute of limitations to "breach of fiduciary relationship growing out of the partnership agreement"). We also note that effective November 1, 1996, the Oklahoma legislature re-numbered § 95(9) as § 95(10). However, because Chickasaw filed its

Thus, each of Chickasaw's claims is governed by a five-year statute of limitations.

The parties dispute, however, the application of Oklahoma's general rule that a statute of limitations does not commence to run until a plaintiff has a legal right to sue, i.e., until the plaintiff can effectively maintain an action. See *Greer*, 911 P.2d at 261; *Allied Fidelity Ins. Co. v. Bank of Oklahoma, N.A.*, 894 P.2d 1101, 1103 (Okla.1995); *Samuel Roberts Noble Foundation, Inc. v. Vick*, 840 P.2d 619, 622 (Okla.1992). While Oklahoma courts have considered specific accrual standards for certain contract [5] and tort [6] actions, the parties do not cite, nor have we found, any Oklahoma cases directly addressing accrual of the type of contract and tort claims presented in this case.

## A. Breach of Contract

We think it clear under Oklahoma law that a breach of the partnership agreement occurred when Southwestern Bell filed the FCC application on its own behalf, specifically stating that the limited partnership had no interest in the application. "A breach of contract is a material failure of performance of a duty arising under or imposed by agreement." *Lewis v. Farmers Ins. Co.*, 681 P.2d 67, 69 (Okla.1983). The partnership agreement stated that applications to provide cellular services to RSAs adjoining the Oklahoma City SMSA "shall be deemed to be filed on behalf of the partnership." South-

western Bell materially failed to perform this duty, making it clear both to the FCC and to Chickasaw that its application was filed on its own behalf. Thus, Chickasaw could have maintained its action, and the statute of limitations began to run, once Southwestern Bell filed its FCC application on October 19, 1988. Because Chickasaw did not file this action until June 7, 1996, the district court correctly held its breach of contract claim barred by the five-year statute of limitations in Okla. Stat. tit. 12, § 95(1).

Chickasaw argues that Southwestern Bell "continuously, on a daily basis, breaches Sections 6.3, 8.1 and 8.8 of the [partnership agreement]," so Chickasaw's "breach of contract claim is not barred by the applicable statute of limitations." Appellant's Br. at 16. Chickasaw relies primarily on our decision in *Paul Holt Drilling, Inc. v. Liberty Mut. Ins. Co.*, 664 F.2d 252 (10th Cir.1981), to argue that Southwestern Bell has continuing contractual obligations to: (1) acknowledge that its applications were made on behalf of the partnership, and (2) distribute the benefits from the RSAs to the partnership.[7]

While this court and the Oklahoma Supreme Court [8] have recognized that a new cause of action may accrue each time a defendant breaches a continuing contract, this is not such a contract. In *Paul Holt Drilling*, an insurer denied its insureds policy coverage and any obligation to defend them against suits arising from the blowout of an oil well. We held that the insurer's contin-

---

action on June 7, 1996, we refer to the pre-amendment numbering.

**5.** See, e.g, *Vick*, 840 P.2d at 622 (describing general accrual rule for construction contracts as "the limitations period does not begin until the work is completed"); *Kiamichi Elec. Coop. v. Underwood*, 842 P.2d 358, 359 (Okla.Ct.App. 1992) (stating that each monthly due date in an installment contract constitutes a new cause of action, and the statute of limitations begins to run with each new due date).

**6.** See, e.g., *Lovelace v. Keohane*, 831 P.2d 624, 628 (Okla.1992) (holding victim's cause of action for sexual misconduct against priest accrued at end of each alleged sexual encounter, and not upon priest's admission of the sexual misconduct); *Reeves v. Agee*, 769 P.2d 745, 757 (Okla. 1989) (stating statute of limitations on wrongful

prosecution claim began to run when underlying claim was resolved in plaintiff's favor).

**7.** Chickasaw correctly notes that its contract and fiduciary duty claims should be addressed separately. Indeed, while the district court simply rejected "Chickasaw's attempt to escape the limitations bar by arguing a 'containing wrong,'" we note that the continuing wrong doctrine is a tort concept which does not apply to contract actions. See 1 Calvin W. Corman, Limitations of Actions § 7.2.1, at 487 (1991).

**8.** See, e.g., *Western Natural Gas Co. v. Cities Serv. Gas Co.*, 507 P.2d 1236, 1242 (Okla.1972) (holding action not barred by statute of limitations where defendant made continuing violations of its continuing duty to disclose facts relevant to Federal Power Commission's decision to grant defendant's application to abandon gas service).

ued refusal to defend its insureds constituted a series of breaches of its continuing duty to defend. *Paul Holt Drilling,* 664 F.2d at 256. We also explained that continuing contracts are those that require continuing performance for some period of time, and are capable of a series of partial breaches for which " 'a separate action is maintainable, just as in the case of an "installment" contract.' " *Id.* at 255–56 (quoting 4 A. Corbin, Corbin on Contracts § 956, at 841 (1951)).

In this case, the relevant contract provisions clearly state that applications for adjoining RSAs will be deemed to be made on behalf of the partnership, and require Southwestern Bell to make such applications in the partnership's best interest. The breach caused by the FCC application occurred at a fixed point in time for a fixed set of RSAs, and the relevant contract terms did not require the kind of continuing performance for that FCC application described in *Paul Holt Drilling* or in the more traditional installment contract. See, e.g., *Johnson v. Kansas Public Employees Retirement System,* 262 Kan. 185, 935 P.2d 1049, 1054 (1997) (rejecting plaintiffs' arguments that employee benefit contract was continuing contract which was breached each time employees received underpaid benefit check). Any injury allegedly suffered by Chickasaw after this breach constitutes damages flowing from the breach, not continuing breaches.[9] See, e.g., *Hinson v. United Financial Services, Inc.,* 123 N.C.App. 469, 473 S.E.2d 382, 475 (1996) (holding late notice mailed to a debtor in rescission of contract claim was "at worst, an ill effect of the original wrong and is not a wrong in and of itself"); see also 1 Calvin W. Corman, Limitations on Actions § 7.2.1, at 485–86 (1991) (stating statute of limitations begins to run at the time of breach, even

when the extent of actual damages is not then ascertainable).

Our analysis is also consistent with a recent opinion from the Delaware Supreme Court concerning breach of a similar limited partnership agreement to provide cellular telecommunications service. See *United States Cellular Inv. Co. of Allentown v. Bell Atlantic Mobile Systems, Inc.,* 677 A.2d 497, 503 (Del.1996).[10] In *United States Cellular,* the Delaware court held that the statute of limitations for breach of a limited partnership agreement began to run on the date Bell Atlantic, the general partner, filed an FCC application on its own behalf to provide cellular services to two RSAs adjacent to an SMSA in Allentown, New Jersey.[11] Specifically, the court found Bell Atlantic's filing breached the agreement because either "by acting on its own behalf, this action represents an attempt by [Bell Atlantic], the general partner, to compete with the partnership contrary to § 8.8 [of the partnership agreement]," or "even if [Bell Atlantic] was acting for the Partnership or was deemed to have made the application on behalf of the Partnership, [Bell Atlantic] still violated the terms of the agreement since it did not disclose the Partnership's interest on the application." *Id.* Here, Southwestern Bell left no uncertainty on its FCC application that it was acting on its own behalf and not for the partnership. Therefore, as in U.S. Cellular, the application was a breach clearly involving an "attempt to compete with the partnership contrary to § 8.8."

## B. Tortious Breach of Fiduciary Duty

Chickasaw argues that its breach of fiduciary duty claim is not barred because Southwestern Bell continuously breaches its fiduciary duty to Chickasaw. Appellant's Br. at 15. Chickasaw supports this argument with cases concerning slander of title [12] and mis-

---

9. These injuries may include Southwestern Bell's failure to distribute profits from the RSAs to the limited partnership, as Chickasaw urges is required by section 6.3 of the partnership agreement.

10. The district court relied almost exclusively on United States Cellular in its order.

11. The partnership agreement in *United States Cellular* contained a paragraph 8.8, identical to

paragraph 8.8 in this case, which provided that applications for cellular service in RSAs adjoining the SMSA "shall be deemed to be made on behalf of the Partnership." *Id.* at 499 n. 3.

12. See Appellant's Br. at 14 (citing *Young v. Young,* 709 P.2d 1254, 1259 (Wyo.1985); *Polin v. Dun & Bradstreet, Inc.,* 511 F.2d 875, 878 (10th Cir.1975); *New England Oil & Pipe Line Co. v. Rogers,* 7 P.2d 638, 642 (Okla.1931)).

appropriation of trade secrets,[13] arguing that "all are based on continuous and repeated wrongful activity." *Id.*

Chickasaw correctly notes that " 'where a tort involves a continuing or repeated injury, the cause of action accrues at, and limitations begin to run from, the date of the last injury.' " Appellant's Reply Br. at 14 (citing *Tiberi v. CIGNA Corp.*, 89 F.3d 1423, 1430–31 (10th Cir.1996) (quoting 54 C.J.S. Limitations of Actions § 177 (1987)). However, this case does not involve a continuing tort. Chickasaw could have maintained its tort action when Southwestern Bell filed its public FCC application on October 19, 1988, or at least when Southwestern Bell received the rights to provide service to these RSAs (sometime prior to October 2, 1990). Chickasaw's asserted rights were then injured, it was aware of the alleged injury, and nothing prevented it from pursuing a cause of action. See *Tiberi*, 89 F.3d at 1431 (stating continuing wrong doctrine cannot be applied where the plaintiff's injury is definite and discoverable, and nothing prevented the plaintiff from coming forward to seek redress). Because Chickasaw brought this action more than five years later than either date, the district court properly held this tort claim barred by the statute of limitations in Okla. Stat. tit. 12, § 95(9). Subsequent alleged injuries to Chickasaw constitute damages from the original breach of fiduciary duty, not continuing harms from which new causes of action accrue. See, e.g., *Nesovic v. United States*, 71 F.3d 776 (9th Cir.1995) (rejecting plaintiff's assertion that IRS committed continuing wrong by pursuing tax lien because tax assessment was the single wrongful act, while subsequent injuries were ill effects from original violation); *Daboub v. Gibbons*, 42 F.3d 285, 290–91 (5th Cir.1995) (determining continued sales of and profits from alleged wrongful copyright "elucidates a concept of continuing damages, rather than a continuing tort").

Moreover, the authorities relied upon by Chickasaw are indistinguishable from the present case. *Tiberi* is a fraud case involving a New Mexico contract under which the plaintiffs agreed to sell only the defendant's insurance, and suffered significant losses when the defendant abandoned the insurance program. In *Tiberi*, we stated that the continuing wrong doctrine may be applied to the fraud claims because the defendant: (1) assured the plaintiffs of its continuing support for the insurance program, (2) never informed the plaintiffs of its reservations concerning the program, and (3) subsequently called an abrupt end to the program, so it was "reasonable to infer that [defendant] held [plaintiff] to the ... agreement while at the same time taking measures to discontinue it." *Tiberi*, 89 F.3d at 1431. In the present case, the record shows that Southwestern Bell filed the FCC application on its own behalf and notified Chickasaw of that fact. And, Chickasaw does not argue that Southwestern Bell prevented it from bringing an action.

The misappropriation of trade secrets and title slander cases are also distinguishable because the uniformly involve continued tortious conduct, rather than damages flowing from an initial tortious act. See *Young*, 709 P.2d at 1259 (applying continuing tort theory narrowly to repeated misappropriation of intermittent royalty payments); *Telex*, 367 F.Supp. at 359–60 (applying continuing wrong theory to IBM's counterclaim where plaintiffs continued to misuse IBM's trade secrets and programs); *Rogers*, 7 P.2d at 642 (holding slander of title action does not accrue until defendant ceases to make adverse claims against title).

### C. Effect of Alleged Negotiations Concerning the RSAs

Alternatively, Chickasaw argues that even if we determine no continuing breaches or wrongs existed, the statute of limitations did not begin to run until November 7, 1991, the first time, according to Chickasaw, that Southwestern Bell "unequivocally communicated its intent to repudiate its obligations under the Partnership Agreement." Appel-

---

**13.** See Appellant's Br. at 15 (citing *Telex Corp. v. International Bus. Machs. Corp.*, 367 F.Supp. 258, 261 (N.D.Okla.1973)).

**1348**

lant's Br. at 23. Chickasaw argues that Southwestern Bell did not make a complete anticipatory repudiation of the contract in October 1988, because its actions and representations indicated that the issue of Chickasaw's carry-on rights remained unresolved.[14]

We have determined that Southwestern Bell breached the agreement when it filed its FCC application, and breached its fiduciary duty either when it filed its FCC application or received the rights to the RSAs.[15] Therefore, this is not a case where Southwestern Bell made an anticipatory repudiation of the agreement with statements or actions, and Chickasaw's arguments concerning anticipatory repudiation are misplaced. Compare *Lewis*, 681 P.2d at 69 ("A breach of contract is a material failure of performance of a duty arising under or imposed by agreement.") with Restatement (Second) of Contracts § 250 (1981) (defining repudiation as a statement that an obligor will commit a breach, or an act which renders an obligor unable or apparently unable to perform without such a breach).

For the foregoing reasons, we AFFIRM the judgment of the district court, granting summary judgment against Chickasaw because its claims are barred by the applicable Oklahoma statutes of limitation.

---

**14.** Chickasaw supports this allegation with its Executive Vice President's affidavit. See Appellant's App. at 289–90.

**15.** Chickasaw did not plead, focus on the necessary factors, or otherwise pursue a claim that the statute of limitations was tolled under the doctrine of equitable estoppel. See, e.g., *Sanchez v. City of Sand Springs*, 789 P.2d 240, 241–42 (Okla. 1990) (discussing equitable estoppel where statute of limitations is tolled because defendant causes plaintiff to delay filing action).