Charles MUNAFO, Plaintiff,

v.

METROPOLITAN TRANSPORTATION AUTHORITY, et al., Defendants.

Nos. 98–CV–4572 (ERK), 00–CV–0134 (ERK).

United States District Court, E.D. New York.

Aug. 4, 2003.

---

Dorothea W. Regal, Kathleen L. Lowden, Randi Seltzer May, Hoguet Newman & Regal, LLP, New York City, for Defendants.

Scott A. Korenbaum, New York City, Plaintiffs.

KORMAN, Chief Judge.

Plaintiff Charles Munafo brought an action against his former employer, Staten Island Rapid Transit Operating Authority ("SIRTOA"), and various individual defendants acting as its agents, under 42 U.S.C. § 1983, alleging that SIRTOA terminated him in retaliation for exercising his First Amendment right to free speech. The facts of this action are detailed fully in my Memorandum and Order dated January 22, 2003. *See Munafo v. Metropolitan Transp. Authority,* 2003 WL 21799913 (E.D.N.Y.2003). After a week-long trial, the jury returned a verdict which resulted in a judgment for the defendants. Al-

though the jury found that Munafo's rights had been violated by several of SIRTOA's employees, it also found that the actions of these employees would have been taken independent of Munafo's exercise of First Amendment rights. Munafo now moves to alter the verdict or order a new trial with respect to the defendants found to have violated Mr. Munafo's constitutional rights, arguing that the jurors actually intended to rule for Munafo and only mistakenly answered the special verdict form in a manner inconsistent with a verdict for the plaintiff. For the reasons set forth below, plaintiff's motion is denied.

## BACKGROUND

The trial of plaintiff Charles Munafo's lawsuit against defendants Alphonso Sorrentino, Peter Argenziano, John McCabe, Owen Swords and David Filimon began on February 24, 2003. During the course of the five-day trial, Owen Swords was dismissed as a defendant. At the conclusion of the evidence, I instructed the jury as to the required threshold inquiry in a First Amendment case: whether the constitutionally protected speech was a "substantial" or "motivating" factor in the defendants' decision to terminate Mr. Munafo. I then instructed the jury regarding the "dual motive" defense as articulated in *Mount Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283–87, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Plaintiff did not object to either of these instructions. The jury deliberated for approximately twenty-four hours before announcing its verdict on March 5, 2003.

The jury was given a special verdict form containing four questions; the form was reviewed and approved by both parties (Tr. 1699). The first question required the jury to determine whether Mr. Munafo "engaged in the constitutionally protected speech that the Court de-

scribed." (Verdict Sheet, attached as Exhibit A to Declaration of Scott Korenbaum dated March 18, 2003). The jury answered this question in the affirmative. The second question required the jury to determine, with respect to each defendant, whether "plaintiff's constitutionally protected speech was at least a 'substantial' or 'motivating' factor" in Munafo's dismissal. (*Id.*). The jury found that defendants Sorrentino, Argenziano, and McCabe were motivated by Munafo's protected speech. However, the jury found that defendant Filimon, who actually made the decision to terminate plaintiff, was not motivated by plaintiff's constitutionally protected speech. Question 3 requested that the jury determine whether the defendants "would have taken the same action even if plaintiff had not engaged in any of the constitutionally protected speech." (*Id.*). The jury answered this question "Yes" for defendants Sorrentino, Argenziano, and McCabe, and answered "No" for defendant Filimon. The final question contained on the special verdict form required the jury to determine whether "plaintiff unreasonably chose not to participate in the disciplinary process provided for by the collective bargaining agreement and that his participation could have led the Standing Board of Arbitration or any other hearing officer in the process to decide not to terminate Mr. Munafo?" (*Id.*). The jury answered the fourth question "No."

Under the dual-motive defense of *Mount Healthy,* the jury's findings resulted in a verdict for the defendants. After the jury announced its verdict, I polled each individual juror and verified that the answers marked on the special verdict sheet reflected the true verdict of each juror (Tr. 1683–84). A short time after the jury was dismissed however, I was informed by my law clerk that one of the jurors had expressed shock at the ultimate conclusion and maintained that the jury had in fact intended to rule for the plaintiff (Tr. 1686). I then reconvened the jury and confirmed, once again, that the jury's answer to Question 3 was "Yes" as to defendants Sorrentino, Argenziano and McCabe (Tr. 1688–89). The foreperson expressed that, "We thought it would be a different outcome" (Tr. 1688), at which point I briefly explained why their findings of material fact resulted under the law in a verdict for the defendants. The jury was then dismissed again.

After consultation with counsel, I reconvened the jury for a third and final time. Although all seven jurors reiterated that the verdict sheet accurately reflected their answers to the special verdict questions, two of the jurors expressed objections to the result. Juror No. 1, Saverio Calvacca, and Juror No. 7, Victor Strammiello, indicated that they believed the verdict did not reflect the jury's true intent (Tr. 1703; 1708; 1710). Although there was some initial indication by Jurors 1 and 7 that they misunderstood the questions on the verdict sheet, (Tr. 1705; 1708–10), further discussion illustrated that their confusion stemmed from a misconception about the outcome or legal consequence of their answers:

Juror No. 1: "[W]e didn't understand it . . . you told us the law after we picked it." (Tr. 1703).

\* \* \* \* \* \*

Juror No. 7: "How does the laymen (sic) come up with knowledge that even some lawyer friends of mine don't—can't even talk about and we're supposed to come up with a verdict . . . I mean, I have a sour taste in my mouth. And because we misinterpreted part of the law that we didn't understand and here we are with a verdict that is really not . . . our intent." (Tr. 1714).

\* \* \* \* \* \*

Juror No. 7: "We made a mistake; yes, I guarantee. But we made a mistake because we don't know the law and we're not expert at the law. We're laymen." (Tr. 1715).

I carefully explained to the jurors that their sole job was to determine the facts, not the legal consequences of those factual findings (Tr. 1718). Thus, I noted that the jury's understanding of the law was unnecessary to their determination of the factual issues contained on the special verdict form (Tr. 1715–17). Nevertheless, the legal consequences of the jury's answers to the special interrogatory questions were described in detail in the jury charge:

[I]f you find that there was more than one motive you may find for a defendant if that defendant has proven, by a preponderance of the evidence, that he would have taken the same action even if the plaintiff had not engaged in any of the protected speech. If you find that the defendants would have taken the same action against Mr. Munafo even if he had not engaged in such speech, then you must find for the defendants.

In other words, if you find that a defendant took adverse action against the plaintiff for both proper and improper reasons, and you find that the defendant would have taken the same actions based on the proper reasons alone, that defendant is not liable for retaliation.

(Jury Charge p. 13, attached as Exhibit B to Declaration of Dorothea Regal dated April 4, 2003).

Following this extensive colloquy with the jurors, I determined that the two jurors who had voiced objections to the verdict were dissatisfied not with their answers to Question 3, but with the *outcome* of the case. Indeed, the jurors clearly expressed their sympathy for the plaintiff and even suggested that, if given the chance, they would change their answers to the special verdict questions in order to ensure a victory for the plaintiff:

Juror No. 1: "[Y]ou told us the law after we picked it. Now, knowing the law, no, we would have went the other way." (Tr. 1703).

\*      \*      \*      \*      \*      \*

Juror No. 1: "Even if we again misunderstood, we are for the plaintiff on this. That's why we would say no to—that's my point. We are for the plaintiff to begin with ... We didn't—we never changed that." (Tr. 1705).

\*      \*      \*      \*      \*      \*

Juror No. 1: "In all honestly (sic), you know what we agreed to, that was for the plaintiff. So, we made a mistake the wrong way but in our hearts, we were for the plaintiff. I know we agreed to the question not realizing—"

The Court: "Yes, not realizing that it would—but that's my point. You answered the question—"

Juror No. 1: "Not realizing what it meant to the stuff."

.      .      .      .      .

The Court: "It's too bad because we don't go in—juries are not permitted to go in and decide cases based on who they think should win or lose without regard to what their judgment is about critical issues that go into the verdict.

What you would like to do is make up your mind and that's exactly what you told me, that you want to rule for the plaintiff, so you'll just answer any question that you have to answer in order to achieve that result. That's not the way the system works." (Tr. 1710–11).

Because the result of the jury's fact-finding cannot be result-oriented, I found no basis for overturning the verdict and dismissed the jury:

It's quite clear to me that they were sympathetic to the plaintiff. They wanted him to win and their problem is that they didn't know that their finding of fact that they made would have caused him to lose ... But my basic understanding of exactly what they were saying was that if they would have known that this would have caused the plaintiff to lose, that they would have answered the question differently. And that's not a reason to set aside a verdict.

(Tr. 1723–25).

In support of his motion, plaintiff has submitted affidavits from two jurors, Saverio Calvacca (Juror No. 1) and Victor Strammiello (Juror No. 7)—the same jurors who expressed dissatisfaction during the post-trial colloquy. These affidavits, prepared by plaintiff's attorney, purport to establish the jury's misunderstanding of special verdict sheet Question 3. In support of Munafo's contentions, Mr. Calvacca attests that, contrary to my analysis following the post-trial colloquy with the jury, the jury was not simply unaware of the legal consequences of their factual findings and unhappy with the result, but actually misunderstood the question itself. (Affidavit of Saverio Calvacca dated March 18, 2003, ¶ 4). Specifically, he asserts:

The jury never believed that by answering "YES" to each of the defendants' names (except Mr. Filimon) that we were finding that the defendants had not violated Mr. Munafo's constitutional rights. While the Court explained that this was the result of our answer, we firmly believed to the contrary.

\*      \*      \*      \*      \*      \*

Each juror believed that by answering "YES" we were saying that the defendants had fired Mr. Munafo because of his constitutionally protected speech, and that the defendants would not have fired him if he had not engaged in the constitutionally protected speech. We clearly answered this question the way we did because we misunderstood it. I stated as much to the Court when given the opportunity.

(*Id.* at ¶¶ 6–7). Mr. Strammiello similarly contends that the jury misinterpreted the question itself rather than merely the results of their factual findings:

Having thought about the Court's comments to the jury, it appears that the Court misconstrued my comments, as well as Saverio's comments. At no point did we believe that by answering "YES" to each of the defendants' names (except Mr. Filimon) that we were finding that the defendants had not violated Mr. Munafo's constitutional rights. While the Court explained that this was the result of our answer, we firmly believe to the contrary.

\*      \*      \*      \*      \*      \*

So there should be no mistake, each and every juror believed that by answering "YES" we were saying that the defendants had fired Mr. Munafo because of his constitutionally protected speech, and that the defendants would not have fired him if he had not engaged in the constitutionally protected speech. We clearly answered this question the way we did because we misunderstood it.

(Affidavit of Victor Strammiello dated March 18, 2003, ¶¶ 5–6).

Jurors Calvacca and Strammiello also indicated that their confusion regarding Question 3 affected their answer with respect to Mr. Filimon:

Because of our misreading and misunderstanding of Question 3, we also checked "NO" to Mr. Filimon in Question 3. We answered this way about Mr. Filimon in Question 3 because we had already concluded in Question 2 that Mr. Munafo had not presented sufficient

evidence to establish that his "constitutionally protected speech was at least a 'substantial' or 'motivating factor' in his dismissal with respect to" Mr. Filimon. By checking "NO," we wanted to distinguish Mr. Filimon and the other defendants.

(Strammiello Aff. at ¶ 7; *see also* Calvacca Aff. at ¶ 8).

Although affidavits from only two jurors were submitted, both affiants attempted to impute their statements to the remainder of the jury:

> I believe, and, as was stated in open court by Juror Number 7 (Victor), *each juror believes,* that a grave injustice has occurred to Mr. Munafo. Because of our (the jury's) misreading of Question 3, Mr. Munafo did not obtain a favorable verdict. (Calvacca Aff. at ¶ 3)(emphasis added).

\* \* \* \* \* \*

> I made clear to the Court that *each and every juror* thought that we made a mistake in answering Question 3, and that I did not understand Question 3. I also agree with Victor's statement that the verdict did not represent the intent of my fellow jurors. (Calvacca Aff. at ¶ 11)(emphasis added).

\* \* \* \* \* \*

> As I mentioned on March 5th, *each of my fellow jurors* also believes that a grave injustice has occurred. Mr. Munafo did not obtain a favorable verdict because each juror misunderstood the meaning of Question 3 contained on the Special Verdict Form. (Strammiello Aff. at ¶ 3)(emphasis added).

\* \* \* \* \* \*

> As I stated on March 5th, the verdict in favor of the remaining three defendants has left a very sour taste in my mouth and in the mouths of the remaining jurors. (Strammiello Aff. at ¶ 9).

On the basis of these affidavits, plaintiff moves pursuant to Rules 59(a) and 59(e) of the Federal Rules of Civil Procedure, to alter or amend the judgment to provide that Charles Munafo prevailed at trial and order a new trial on the issue of damages only. In the alternative, plaintiff moves for a new trial on all issues. Defendants argue that the affidavits are inadmissible pursuant to Rule 606(b) of the Federal Rules of Evidence. Moreover, defendants contend that the statements of the two jurors, even if admissible, are entitled to little weight because they were solicited through ex-parte communications with plaintiff's attorney and contradict statements made by the same jurors during the post-trial colloquy.

## DISCUSSION

Juror testimony is generally inadmissible when used to impeach a verdict. Federal Rule of Evidence 606(b) provides:

> *Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations* or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. *Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.*

(Emphasis added). The Rule serves to "promote free and uninhibited discourse during deliberations," guard jurors from attempts to influence them after trial, and preserve the finality of verdicts. *Attridge v. Cencorp Div. of Dover Tech. Int'l.*, 836 F.2d 113, 116 (2d Cir.1987).

Rule 606(b)'s prohibition is not absolute; exceptions have been recognized where jurors are asked to testify concerning extraneous prejudicial information or improper external influences that interfered with deliberations. FED. R. EVID 606(b); *See also McDonald v. Pless*, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915). But in determining whether a juror's post-trial statements may impeach a jury verdict, the Court must balance the parties' interest in "a fair trial but not a perfect one, for there are no perfect trials," *McDonough Power Equip. Inc. v. Greenwood*, 464 U.S. 548, 553, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), with the jurors' interest in avoiding harassment—

> Jurors have a right to go home at the end of the trial … secure in the belief that they will not be harassed and they will not be questioned, and they have a right to return to the community and enjoy the privacy and anonymity that they enjoyed before they were summoned to serve as jurors.

*United States v. Radonjich*, 1 F.3d 117, 120 (2d Cir.1993). The need to protect jury deliberations from post-trial attack was acutely emphasized by the Advisory Committee while developing Rule 606(b). The Committee wrote that "[p]ermitting an individual to attack a jury verdict based upon the jury's internal deliberations has long been recognized as unwise by the Supreme Court." FED.R.EVID. 606 advisory committee's note. Indeed, the Supreme Court has warned in no uncertain terms that post-trial inquiry into a verdict severely undermines the confidentiality of jury deliberation and erodes the finality of verdicts:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

*McDonald v. Pless*, 238 U.S. at 267–68, 35 S.Ct. 783 (cited in FED. R. EVID. 606 advisory committee's note).

Nevertheless, banning inquiry into the deliberative process makes sense only if the verdict reflects the true intent of the jury. "Unyielding refusal to question jurors is without sound judgment where the court surmises that the verdict announced differs from the result intended." *Attridge*, 836 F.2d at 114. As recognized by the Second Circuit, Rule 606(b) "is silent regarding inquiries designed to confirm the accuracy of a verdict." *Id.* at 116. Accordingly, "juror testimony is admissible to show that the verdict delivered was not that actually agreed upon." *Id.* A court may interview jurors and consider their testimony "to correct the mistaken transmission of the verdict from the jury," as long as the inquiry is limited "to ascertain what the jury decided [rather than] why they did so." *Id.* at 117. *See also Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1548 (10th Cir.1993) ("we agree with

the Second Circuit that Rule 606(b) ... does not preclude a juror from testifying as to the potential miscommunication of the verdict"); (*McCullough v. Consolidated Rail Corp.*, 937 F.2d 1167, 1172 (6th Cir.1991)) (following *Attridge* and holding that where the district court merely asks for clarification of the final award, Rule 606(b) is not violated).

However, the evidence in this case demonstrates that whatever "mistake" the jury might have made, it is not one that merits the remedy plaintiff seeks. The plain meaning of Rule 606(b) "restrict[s] the impeachment of a verdict allowed by *Attridge* to those circumstances where it is clear that a verdict has been miscommunicated to a court. Any other rule would undermine the finality of verdicts and encourage the harassment of jurors after their service has ended." *Clark v. Westchester County*, 1998 WL 709834, *5 (S.D.N.Y. Oct. 9, 1998). There is no such miscommunication here.

■■■ When considering a motion for a new trial based on an alleged error in the special interrogatories posed to the jury, the court must determine if the interrogatories submitted to the jury, when read in conjunction with the jury charge, fairly and accurately framed the issues to be decided. *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir.1993). A new trial should only be granted if the special interrogatories used served to mislead and confuse the jury or inaccurately framed the issues to be resolved. *Cann v. Ford Motor Company*, 658 F.2d 54, 58 (2d Cir.1981). Plaintiff does not contend that the charge with respect to *Mt. Healthy's* dual motive defense was defective in any manner.[1] Nor was any objection raised by either party asserting that the special verdict form was

at all unclear or misleading. So long as there is nothing misleading about the special verdict form or the instructions that guided it, a district court is entitled to rely upon the jury's finding and enter a judgment upon it. *Parker v. Sony Pictures Entertainment, Inc.*, 260 F.3d 100, 108 (2d Cir.2001). Indeed, "[t]he court must assume that the jury followed not only the law as explained to it in the jury charge but also the literal, grammatical meaning of the special interrogatories posed." *Keywell Corp. v. Piper & Marbury LLP*, 2001 WL 967567, *4 (W.D.N.Y. Aug. 22, 2001) (citing *Manufacturer's Hanover Trust v. Drysdale Sec. Corp.*, 801 F.2d 13, 27 (2d Cir.1986)).

The literal, grammatical meaning of Question 3 could not have been more straightforward and clearly articulated: "[D]o you find that defendant would have taken the same action even if plaintiff had not engaged in any of the constitutionally protected speech?" There is nothing ambiguous or confusing about this language and plaintiff cannot point to anything in the special verdict interrogatories or the charge that was misleading. Nor does it appear that the jury was truly confused by or misinterpreted Question 3. During its deliberations, the jury never requested clarification of the question or instruction although it sent a number of notes to the Court, including a request for clarification regarding another aspect of the jury charge explaining the statute of limitations defense (Court Ex. 16). The jurors were individually polled not once, but twice, and each time confirmed that the verdict as read by the Court from the special verdict form accurately reflected his or her verdict. The second poll even occurred after the jury was informed that its answers to

---

1. It is important to note that plaintiff's counsel objected to other portions of the jury instructions, even expressly requesting that a time qualification be added to the *Mount Healthy* charge, but did not object to the "dual motive" instruction.

the special verdict questions resulted in a victory for the defendants. Moreover, statements from several jurors after they were polled a second time confirmed that the jurors misunderstood the *consequences* of their answer to Question 3 rather than the question itself. As the foreperson explained, they "thought it would be a different outcome." (Tr. 1688). Once being informed of the consequences of their findings, at least one juror explicitly stated that the jury would have altered its responses to the interrogatories in order to conform to the desired result: "Juror No. 1:[W]e didn't understand it . . . you told us the law after we picked it. Now, knowing the law, no, we would have went the other way." (Tr. 1703).

Judge Cote's decision in *Clark v. Westchester County*, 1998 WL 709834 (S.D.N.Y. Oct. 9, 1998), is particularly instructive. The jury in *Clark* delivered a verdict for excessive force against the defendant and awarded damages of $5,000, also finding that the plaintiff was 80% responsible for his own injuries. However, the jury was apparently confused by the applicable comparative negligence statute and "did not understand that the award [they rendered] would be reduced" based on the plaintiff's negligence. *Id.* at *1. Plaintiff moved post-trial to amend the judgment to reflect the jury's intent to award the full $5,000 and submitted seven identical affidavits from the jurors explaining their mistake and stating that they wanted to increase the damages award to $25,000. *Id.* at *2. Judge Cote declined to grant a new trial or to amend the verdict based on the post-trial juror affidavits primarily because the statements of the jurors did not establish that the jurors misunderstood the charge or erred in transmitting the verdict, but only that the jurors "wanted [the plaintiff] to receive $5000 and 'now underst[ood]' that in order to accomplish that, they would have to increase the amount of the damage award to $25,000." *Id.* at *5. As here, "the jurors had been individually polled and confirmed that the verdict as read by the court from the special verdict form accurately reflected their verdict." *Id.* Since the jurors statements may have reflected sympathy for the plaintiff or disagreement about the operation of the comparative negligence doctrine, but did not clearly reflect a misunderstanding of the court's charge or error in the transmission of the verdict, Judge Cote found it inappropriate to amend the verdict or grant a new trial. *Id.* Similarly, the jurors in this case expressed sympathy towards Mr. Munafo and indicated their desire for him to prevail. Nevertheless, their responses to the special verdict interrogatories were insufficient for an imposition of liability. The subsequent affidavits by jurors Calvacca and Strammiello merely reflect their new-found understanding that to accomplish their desired result they would need to go back and amend their answer to Question 3 of the special verdict form.

█ The circumstances in *McNulty v. Borden, Inc.*, 542 F.Supp. 655 (E.D.Pa. 1982), bear even closer resemblance to the issue here. In *McNulty*, the plaintiff moved for a new trial on his wrongful termination claim, arguing that the jurors believed they were finding for the plaintiff and would have answered an interrogatory differently had they known the effect of their answer on the ultimate result. *Id.* at 657. Specifically, in the first interrogatory, the jurors found that plaintiff had been improperly terminated solely for refusing to offer preferential deals to one of the defendant's customers. However, in the second interrogatory, the jury found that the plaintiff had not established a violation of federal antitrust law. Because plaintiff's claim for wrongful termination under Pennsylvania law required proof that he was asked to perform an act contrary to a

clear mandate of public policy and was terminated when he refused to perform such an action, the jury's conclusion in the second interrogatory precluded a victory for the plaintiff. As here, a post-trial affidavit from one of the jurors was submitted stating that the jury believed it was ruling in favor of the plaintiff and would have answered the second interrogatory differently if it had been aware of the consequences of its answer. In denying plaintiff's request for a new trial, the court implicitly recognized the same principle I communicated to the jury following the post-trial inquiry into its verdict—the jury's misconception · of the legal consequences engendered by its specific factual findings is insufficient to warrant impeachment of the verdict:

> Nor do we believe that letting the jury's responses to the interrogatories stand would produce a miscarriage of justice, even assuming, arguendo, that the jury believed its response to the first interrogatory, concerning the reasons for plaintiff's dismissal, was sufficient to impose liability on the defendant. The jury was not asked for a general verdict, but only for its answers to two interrogatories. Its responses to those interrogatories were insufficient for an imposition of liability. Its conclusions on the ultimate liability of the defendant are irrelevant. A juror cannot impeach his verdict by testifying that he was mistaken as to what verdict would be entered on the basis of his answers to interrogatories.

*Id.* at 658.

■ As in *McNulty,* the jury in this case was not asked for a general verdict, but only for its answers to four specific factual interrogatories. The fact that these jurors may have mistakenly believed their answer to the second interrogatory with respect to the violation of Mr. Muna-

fo's constitutional rights sufficient to impose liability is irrelevant. Nor can the jury go back and change its answer to an interrogatory because it is dissatisfied with the result. Indeed, use of special verdict forms is designed precisely to avoid a verdict based upon the jury's sympathies or view of who should prevail regardless of the controlling law. As one court aptly described it, special verdicts are "designed to prevent the jury's view of the correct result from interfering with its factual findings." *Carvalho v. Raybestos–Manhattan,· Inc.,* 794 F.2d 454, 457 n. 2 (9th Cir.1986). The jury's province when answering special verdict questions is strictly one of fact-finding, without regard to the legal consequences that ensue. *See Ratigan v. New York Central R.R. Co.,* 181 F.Supp. 228, 232 (N.D.N.Y.1960). *See also* James W. Moore et al., Moore's Federal Practice ¶ 49.02[2][b] (3d ed. 1998) ("Pursuant to [FED.R.CIV.P.] 49(a), the jury returns its special verdict in the form of written answers to separate questions concerning specific factual issues. The trial court then applies the law to those answers and enters judgment accordingly.").

Contrary to Munafo's assertion, the jury's verdict is not inherently inconsistent. The jury clearly exonerated Mr. Filimon, the hearing officer who heard all of the evidence against Mr. Munafo, listened to Munafo's own version of the pivotal events, and ultimately rendered the decision to terminate Munafo's employment. Defendant Sorrentino, Munafo's immediate supervisor, initiated the disciplinary process and was the principle complainant against him, but did not have the authority to determine the discipline imposed or even whether discipline was warranted. The remaining defendants were hearing officers considering Munafo's appeal of Filimon's determination, but had only Filimon's unchallenged decision before them since Munafo refused to participate in his

own defense on appeal. Thus, it would be entirely consistent for the jury to find, as it did, that defendant Sorrentino's improper motive was cleansed by the independent review of a supervisor untainted by discriminatory animus, and that defendants Argenziano and McCabe would have taken the same actions (essentially rubber-stamping Filimon's uncontested decision), even if Munafo had not engaged in constitutionally protected speech.

Plaintiff argues that the affidavits of jurors Calvacca and Strammiello establish the jury's confusion as to the special verdict form itself. Such affidavits, obtained through ex-parte solicitation by counsel and fueled by the jurors' professed desire to see Mr. Munafo prevail, are entitled to little weight. The Second Circuit's decision in *Attridge* recognized the validity of questioning jurors as to the accuracy of a verdict, but did not contemplate wholesale canvassing of jurors by the vanquished party outside the protective confines of the courthouse. *Attridge* merely permitted the trial judge to conduct individual questioning of jurors, on the record, and with counsel present, to ascertain whether the announced verdict reflected their true intent. 836 F.2d at 115. *See also TeeVee Toons, Inc. v. MP3.Com, Inc.,* 148 F.Supp.2d 276, 277 (S.D.N.Y.2001) (where jurors notified court that a mistake was made in transferring the amount of damages agreed upon onto the verdict sheet, the court interviewed each individual juror with counsel present to ascertain whether the jurors unanimously and unequivocally reached a decision different than the one reported); *Mount Airy Lodge, Inc. v. Upjohn Co.,* 96 F.R.D. 378, 381 (E.D.Pa.1982) (court conducted interviews *on the record* to determine whether verdict was miscommunicated to the court). There is no viable justification or authority for an attorney's ex-parte solicitation of juror statements in the manner conducted here. Indeed, such a practice eviscerates the fundamental underpinnings of Rule 606(b) that jurors must be protected from post-trial harassment. As the Supreme Court explicitly recognized, if verdicts could be set aside on these grounds, jurors would always be "harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict ... [and] the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference." *McDonald v. Pless,* 238 U.S. at 267–68, 35 S.Ct. 783.

The inherent danger of allowing counsel to solicit post-verdict juror testimony unchecked by the adversary process or the watchful eyes of the judge is illustrated by *Continental Casualty Co. v. Howard,* 775 F.2d 876 (7th Cir.1985). After the jury in *Howard* returned a small damage award in a case with multiple claims, the prevailing party, Mr. Howard, contacted jurors on more than one occasion (despite the court's admonishment to refrain from doing so) and eventually produced an affidavit from the foreman stating that the jury had intended to return a much larger verdict but had inadvertently failed to enter a verdict sheet consistent with that result. *Id.* at 878. In striking the affidavit and refusing to alter the verdict, the Seventh Circuit strongly disapproved of the "individual questioning of jurors outside the confines of the courtroom." *Id.* at 886. The Court was particularly troubled that the affidavit appeared to have been drafted by Mr. Howard's attorney and was inconsistent with the sworn proceedings—the jurors had all been polled, affirmed the verdict on the record, and remained silent when asked if they had any objection or dissent

to the announced verdict. *Id.* Recognizing the possibility of verdict tampering posed by post-trial communication with jurors by only one side, the Seventh Circuit held that the correct procedure for clarifying apparently inconsistent verdicts is to petition the court for clarification of the decision before the jury is discharged, when the inquiry may be conducted on the record and free from external influences. *Id.*

The jurors in this case were polled twice, both times unanimously affirming the verdict announced in ôpen court. They were also recalled on two occasions and questioned extensively regarding any confusion or mistake. After this exhaustive investigation, conducted transparently, before a court reporter, and with all interested parties present, the unmistakable conclusion was that no mistake in the transmission of the verdict occurred. That plaintiff has submitted affidavits from two jurors contradicting the results does not invalidate this investigation. These jurors have since been informed by the court that a different answer to Question 3 on the special verdict form would have resulted in a victory for the plaintiff. They have subsequently been questioned by plaintiff's counsel outside the confines of the courtroom with no independent verification of the extent of the examination, what was said or whether the jurors were improperly influenced. Indeed, the affidavits were drafted by plaintiff's counsel and bear the imprint of legal arguments unlikely to have stemmed from the jurors' own understanding of the case.[2] Under these circumstances, it is not surprising that the affidavits are precisely crafted to fall within the narrow exception of Rule 606(b) and support plaintiff's request for an altered verdict or new trial. Their merit, however, is suspect, and insufficient to overcome the considerable evidence on the record that the jury's mistake was not a misunderstanding of the special verdict interrogatories or instructions, but a misconception of the legal consequences stemming from their factual findings.

The affidavits are defective for yet another reason—they reflect the sworn statements of only two jurors. "In addition to preventing juror harassment and assuring the finality of verdicts, Rule 606(b) prevents fraud by individual jurors." *Continental Casualty,* 775 F.2d at 885. It accomplishes this by restricting post verdict testimony to instances where " '*all jurors agree* that through inadvertence, oversight or mistake the verdict announced was not the verdict on which agreement had been reached.' " *Id.* (emphasis added) (quoting J. Weinstein, *Weinstein's Evidence* § 606[04], at p. 606–40 (1981)). Without such a limitation, the " 'secret thought of one juror' would have 'the power to disturb the express conclusion of twelve.' " *Continental,* 775 F.2d at 885 (quoting *Mattox v. United States,* 146 U.S. 140, 148, 13 S.Ct. 50, 36 L.Ed. 917 (1892)). Although the affidavits of jurors Calvacca and Strammiello attempt to circumvent this restriction by professing to represent the opinion of each and every juror, the affiants are not competent to testify as to the intentions of the other jurors. Moreover, it is not clear which of several inconsistent positions the other jurors would actually support. When ques-

---

**2.** Both affidavits contain the identical argument that the jury only answered Question 4 of the special verdict sheet because it believed it was answering Question 3 in Mr. Munafo's favor (Calvacca Aff. at ¶ 9; Strammiello Aff. at ¶ 8). While Mr. Munafo's attorney, who raises this argument extensively in his brief, clearly has the legal training and understanding to recognize that Question 4 becomes irrelevant if the jury rules against Mr. Munafo on Question 3, the jury had demonstrated no such awareness and was never instructed to disregard this question if they ruled against Mr. Munafo in Question 3.

tioned on two separate occasions, all seven jurors stated on the record that the answers marked on the special verdict sheet and read out in open court accurately reflected the verdict they agreed upon. Jurors Calvacca and Strammiello expressed dissatisfaction with the outcome, but their statements during the post-trial colloquy support a very different conclusion than the statements in their affidavits. When given the opportunity, none of the remaining jurors revealed their stance on the issue, and plaintiff has presented no evidence demonstrating that the five jurors would concur with the position expressed in the affidavits of Mr. Calvacca and Mr. Strammiello. Consequently, the affidavits submitted by Mr. Munafo are barred by Rule 606(b) and cannot serve as the basis for an amended verdict or a new trial.

## CONCLUSION

During an extensive post-trial colloquy in open court, the jury clearly indicated that their dissatisfaction with the verdict emanated from confusion and disagreement with the legal consequences flowing from their findings of fact. The conflicting post-verdict juror affidavits submitted by Munafo and obtained through the ex-parte solicitation of his counsel do nothing to sway that conclusion. Even if Rule 606(b) did not bar their admission, these affidavits from two dissatisfied jurors would be entitled to little weight and are insufficient to impeach the verdict. Plaintiff's motion to amend the verdict or order a new trial is denied.

**SO ORDERED.**